# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LECG, LLC

        Plaintiff,

                                Civil Case No. 1:06-cv001303 (RCL)

    v.

THE SENECA NATION OF INDIANS

        Defendant.

_____

## STATEMENT OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION TO STAY

### INTRODUCTION

Defendant Seneca Nation of Indians (the "Nation") respectfully requests that the Court stay all proceedings in this duplicative action pending Plaintiff LECG, LLC's ("LECG") exhaustion of remedies in an action previously-filed by the Nation in the Seneca Nation of Indians Peacemakers Court ("Peacemakers Court"), and involving the same questions of law and fact that LECG seeks to litigate here.  It is an elementary tenet of federal Indian law that a party may not circumvent or collaterally attack the jurisdiction of a tribal court by filing a parallel action in federal court.  This rule, which promotes tribal self-government and the authority and development of tribal courts, mandates that the Court stay its hand until the courts of the Seneca Nation have had a full

and fair opportunity to determine their jurisdiction, and, if they find such jurisdiction to

exist, to adjudicate the merits of the dispute between the Nation and LECG.[1]

## FACTS AND PROCEDURAL BACKGROUND

Pursuant to its sovereign authority, the Nation, through the wholly-owned Seneca

Gaming Corporation and its wholly-owned subsidiaries (collectively, the "Gaming

Companies"), operates gaming facilities on the Nation's treaty-protected Territories in

Western New York.[2]  In 2004, the Nation developed "significant concerns regarding the

financing, operation and management" of these facilities.  *Resolution of the Council of*

*the Seneca Nation of Indians Re: Appointment of an Independent Counsel to Investigate*

*the Nation's Casino Development and Management* (Nov. 13, 2004) (hereinafter,

"*Resolution*"), *Declaration of Riyaz A. Kanji in Support of Defendant's Motion to Stay*

(hereinafter, "*Kanji Stay Dec.*") at Att. 1, p.1.  Recognizing the "vital importance" of the

gaming industry to "the economy of the Nation and the general welfare of the Seneca

People[,]" the Council of the Seneca Nation of Indians (the "Council") acted promptly to

ensure that the Nation's gaming facilities had been "constructed, financed, operated and

managed by the [Gaming Companies] in accordance with their Charters and the laws of

the Nation" and that "all financial transactions [conducted by or on behalf of the Gaming

Companies] were *inter alia* conducted at arm's length, in the best interests of the Nation,

in accordance with the [Gaming Companies'] fiduciary and other responsibilities to the

---

[1] For this reason, the Nation has also moved, see Doc. No. 10, for a continuance of the
Local Civil Rule 16.3 Conference and related filing requirements set forth in this Court's
Order dated September 19, 2006 (Doc. No. 9).

[2] Each of the Gaming Companies is organized and chartered under Nation law.

nation, free of any conflicts of interest, and in conformity with all applicable and pertinent laws." *Id.* at Att. 1, pp.1-2.[3]

Specifically, on November 13, 2004, at a regular session of the Council in Council Chambers on the Nation's Allegany Territory, the Council unanimously passed a resolution regarding the "Appointment of an Independent Counsel to Investigate the Nation's Casino Development and Management" (the "Resolution"). *Id.* at Att. 1.[4] In the Resolution, the Council appointed Roscoe C. Howard, Jr. and the law firm of Sheppard, Mullin, Richter & Hampton LLP as Independent Counsel (collectively, "Sheppard Mullin" or "Independent Counsel") to conduct an independent review in order to address the concerns outlined by the Council. *Id.* at Att. 1, p.2. The Resolution outlined the powers to be exercised by the Independent Counsel:

> The [Independent Counsel] shall retain qualified forensic auditors and such other consultants as the [Independent Counsel] may deem necessary to conduct a thorough review of all financial transactions conducted by or on behalf of the [Gaming Companies] relating to the Gaming Facilities . . . . The [Independent Counsel] shall have the authority to interview any officers, employees and staff of the [Gaming Companies], the Nation and any affiliated entities to determine their knowledge of the matters under inquiry. . . . The [Independent Counsel] shall have the authority and power to subpoena documents and testimony from the [Gaming Companies], the Nation, and their officers, agents and employees, and any other person or entity to which such subpoena could be directed under any applicable law.

*Id.* at Att. 1, p.2. In doing so, it nowhere authorized the Independent Counsel to subject the Nation to binding arbitration or to otherwise waive the Nation's sovereign immunity

---

[3] The legislative power of the Seneca Nation of Indians is vested in a duly-elected sixteen-member Council pursuant to Section I of the Constitution of the Seneca Nation of Indians of 1848.

[4] The Council subsequently reaffirmed that it appointed the Independent Counsel "to better enable the Council to exercise its oversight responsibilities over the Nation's gaming operations[.]" *Resolution of the Council of the Seneca Nation of Indians Re: Clarification and Reaffirmation of Appointment of Independent and Special Counsels/Resolution/Approval* (Jan. 8, 2005), *Kanji Stay Dec.* at Att. 2.

from unconsented legal proceedings.  *Id.* at Att. 1.[5]  It is the proper interpretation of this

Resolution that lies at the heart of this case.

Thereafter, Sheppard Mullin inquired with LECG regarding the provision of

forensic auditing services in connection with the investigation.  *See e.g.*, *LECG, LLC

Invoice #40915, Re: Seneca Nation of Indians, Services Rendered Through November 30,

2004* (hereinafter, "*Invoice #40915*"), *Kanji Stay Dec.* at Att. 3, p.3.  On November 29,

2004, LECG sent Sheppard Mullin a letter outlining the terms and conditions of an

agreement to provide such services and attached LECG's boilerplate "Standard

Commercial Terms" (collectively, the "letter agreement").  *Letter from J. Geoffrey

Colton to Mark E. Nagle dated November 29, 2004 Re: Internal accounting investigation

for Seneca Nation of Indians* (hereinafter, "*Letter Agreement*"*), Kanji Stay Dec.* at Att. 4.

LECG's boilerplate language included a clause providing for final and binding arbitration

(and the enforcement of any arbitral award in state or federal court) with respect to "any

controversy, dispute, or claim . . . arising out of, in connection with, or in relation to the

interpretation, performance or breach of this agreement, including any claim based on

contract, tort, or statute[.]"  *Id.* at Att. 4, p.4.  Unbeknownst to the Nation, Sheppard

Mullin purported to sign the letter "on behalf of Seneca Nation of Indians."  *Id.* at Att. 4,

p.2.  Critically, neither the Nation's Council nor any officer of the Nation ever reviewed,

---

[5] "Tribes enjoy immunity from suits on contracts, whether those contracts involve
governmental or commercial activities and whether they were made on or off a
reservation."  *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 760 (1998).
While a tribe or Congress may waive tribal sovereign immunity, any such waiver must be
"clear," see *C & L Enters., Inc., v. Citizen Band Potawatomi Indian Tribe of Oklahoma*,
532 U.S. 411, 418 (2001) (citation omitted), and such waiver "cannot be implied but must
be unequivocally expressed," see *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58-59
(1976) (citations omitted).  In *C & L Enters., Inc.*, the Supreme Court found a clear
waiver where the defendant tribe in that case had itself proposed and signed a contract
containing an arbitration clause.  532 U.S. at 415-23.  Such is far from the case here.

approved, or signed the letter agreement, and the Council never passed any resolution waiving the Nation's sovereign immunity with respect to that agreement.

By its own caption – "Internal accounting investigation for Seneca Nation of Indians" – the letter agreement reflects that LECG, by necessity, would maintain a substantial ongoing presence in the Nation's Territories to perform its forensic accounting. *Id.* at Att. 4, p.1. This is precisely what LECG proceeded to do between December 2004 and April 2005, when, in connection with a review of certain activities relating to the Nation's Gaming Companies, it repeatedly entered the Nation's Territories to avail itself of the authority and privileges granted to the Independent Counsel in the Council's November 13, 2004 Resolution -- LECG's work included, *inter alia*, imaging hard drives, preserving data, extracting emails, and retrieving files and financial data from the computer systems of the Gaming Companies; gathering and reviewing documents held by the Nation and the Gaming Companies; and interviewing the officers, employees, and staff of the Nation and the Gaming Companies. *See LECG, LLC Invoice #44832, Re: Seneca Nation of Indians, Services Rendered Through April 30, 2005* (hereinafter "*Invoice #44832*"), *Kanji Stay Dec.* at Att. 5, pp.4-5; *LECG, LLC Invoice #43727, Re: Seneca Nation of Indians, Services Rendered Through March 31, 2005* (hereinafter "*Invoice #43727*"), *Kanji Stay Dec.* at Att. 6, pp.4-5; *LECG, LLC Invoice #42748, Re: Seneca Nation of Indians, Services Rendered Through February 28, 2005* (hereinafter "*Invoice #42748*"), *Kanji Stay Dec.* at Att. 7, pp.4-5; *LECG, LLC Invoice #42199, Re: Seneca Nation of Indians, Services Rendered Through January 31, 2005* (hereinafter "*Invoice #42199*"), *Kanji Stay Dec.* at Att. 8, pp.4-11; *LECG, LLC Invoice #41542, Re: Seneca Nation of Indians, Services Rendered Through December 31, 2004*

(hereinafter "*Invoice #41542*"), *Kanji Stay Dec.* at Att. 9, pp.3-4. For example, over the course of three weeks in January 2005, LECG's Principals, Experts, Managing Consultants, Senior Consultants, and Senior Managing Consultants entered the Nation's Territories to conduct interviews, review documents and data, meet with Council members, preserve and collect data, perform computer forensics activities, image computer hard drives, and finally to present LECG's preliminary data and findings to the Nation's Council. *See Invoice #42199*, *Kanji Stay Dec.* at Att. 8, pp.4-11.[6]

On or about April 1, 2005, Sheppard Mullin and LECG presented the final findings and conclusions of their investigation to the Nation's Council, President, Treasurer, and legal counsel in Council Chambers on the Nation's Territories. *See Amended Complaint for Declaratory Relief* (hereinafter, "*Amended Complaint*"), Doc. No. 6 at ¶ 17. That presentation included grossly erroneous accounting information purportedly establishing that one of the Gaming Companies, the Seneca Niagara Falls Gaming Corporation ("SNFGC"), had effectively made a $6.3 million interest-free loan to Klewin Construction, the principal contractor for the construction of the Nation's Seneca Niagara Casino, which is located on the Nation's Niagara Territory. *See Amended Complaint*, Doc. No. 6 at ¶ 18; *Letter from Roscoe C. Howard, Jr. to Martin Seneca dated April 27, 2005* (hereinafter, "*Howard Letter*"), *Kanji Stay Dec.* at Att. 12;

---

[6] For payment of services provided in connection with the Independent Counsel's investigation, LECG submitted invoices to Sheppard Mullin, which forwarded those invoices to the Nation. *See, e.g.*, *Letter from Mark E. Nagle to Maurice A. John dated January 25, 2005 Re: LECG, LLC Billing*, *Kanji Stay Dec.* at Att. 10. The Nation made a number of direct payments to LECG from the Nation's general funds totaling over $270,000. *See Checks from the Seneca Nation of Indians to the Order of LECG, LLC dated December 20, 2004, February 25, 2005, March 11, 2005, and April 1, 2005*, *Kanji Stay Dec.* at Att. 11.

*Letter from John I. Salomon to Roscoe Howard dated April 26, 2005* (hereinafter, "*Salomon Letter*"), *Kanji Stay Dec.* at Att. 13. On April 7, 2005, the same erroneous, and highly alarming, information was provided to the Seneca Gaming Corporation's Board of Directors and Audit Committee, in a presentation again taking place on the Nation's Territories. *See Howard Letter, Kanji Stay Dec.* at Att. 12; *Salomon Letter*, *Kanji Stay Dec.* at Att. 13.

Several weeks later, the Vice President of Finance of the Seneca Niagara Casino reported to the Independent Counsel that he could not reconcile the purported $6.3 million interest-free loan with SNFGC's financial records. *See Howard Letter, Kanji Stay Dec.* at Att. 12. This discrepancy was forwarded to LECG. *See id.* at Att. 12. In a letter dated April 26, 2005, LECG confirmed that it had erroneously reported the amount of payments made by SNFGC to Klewin Construction. *See Salomon Letter*, *Kanji Stay Dec.* at Att. 13. In fact, SNFGC had *underpaid* Klewin Construction by $1.5 million during the relevant period. *See id.* at Att. 13. Because LECG's error resulted in substantial damage to the Nation and its Gaming Companies and undermined the credibility of LECG's entire body of work, the Nation declined to act on further invoices submitted by LECG to Sheppard Mullin. *See Letter from Robert Odawi Porter to Catherine J. McEnearney dated September 2, 2005 Re: Outstanding Invoices* (hereinafter "*Porter Letter*"), *Kanji Stay Dec.* at Att. 14.

On October 27, 2005, LECG filed with Judicial Arbitration and Mediation Services, Inc. ("JAMS") a demand for arbitration against the Nation with respect to sums allegedly owed by the Nation for services rendered. *See Demand for Arbitration dated October 27, 2005 filed by Claimant LECG, LLC against Respondent the Seneca Nation of*

*Indians* (hereinafter "*Arbitration Demand*"), *Kanji Stay Dec.* at Att. 15, pp.2-4.  LECG purported to do so pursuant to the boilerplate language contained in the LECG-Sheppard Mullin letter agreement.  *See id.* at Att. 15, pp.3, 8.  In a letter dated November 22, 2005, the Nation, through its Senior Policy Advisor and Counsel, advised JAMS that as a sovereign Indian nation recognized by the United States, it possesses "immunity from unconsented lawsuits or arbitration proceedings that may arise in any forum."  *Letter from Robert Odawi Porter to Jessica Centeno dated November 22, 2005 Re: Response to Arbitration Demand of LECG, LLC* (hereinafter, "*Arbitration Response*"), *Kanji Stay Dec.* at Att. 16, p.1.  The Nation explained to JAMS that it was not party to the letter agreement, that it had never reviewed or approved the letter agreement, and that nowhere in the Council Resolution establishing the Independent Counsel investigation and endowing the Independent Counsel with its powers did there exist "an express authorization for Sheppard Mullin to waive the Nation's sovereign immunity in any retainer agreement with any of the 'qualified forensic auditors' or 'consultants' that it was authorized to retain."  *Id.* at Att. 16, pp.2-3.  Accordingly, the Nation insisted that it had not waived its sovereign immunity with respect to any dispute with LECG and vigorously opposed any attempt by LECG or JAMS to advance the arbitration.  *See id.* at Att. 16; *see also Letter from Robert Odawi Porter to Joseph C. Edmonds dated January 17, 2006 Re: Response to Notice of Commencement of Arbitration* (hereinafter, "*Porter Letter to JAMS*"), *Kanji Stay Dec.* at Att. 17.  (As noted above, see note 4, *supra*, an Indian Nation may only be deemed to have waived its sovereign immunity if such waiver is "clear" and "unequivocally expressed.").  In response to this letter, LECG argued, *inter alia*, that the Council's Resolution authorized Sheppard Mullin to bind the Nation to

arbitration and went so far as to characterize the Nation's position as "frivolous."  *Letter from John F. Cambria to Jessica Centeno dated December 1, 2005 Re: LECG, LLC v. The Seneca Nation of Indians* (hereinafter, "*LECG Arbitration Letter*"), *Kanji Stay Dec.* at Att. 18, pp.2-3.

On January 23, 2006, after JAMS avowed to move forward with the arbitration proceeding in the Nation's absence, see *Email from Joseph C. Edmonds to Robert Porter dated January 18, 2006 Re: LECG, LLC vs. The Seneca Nation of Indians – REF# 1420015562* (hereinafter, "*Edmonds Email*"), *Kanji Stay Dec.* at Att. 19 and *Letter from Kimya S.P. Johnson to Robert O. Porter dated January 10, 2006 Re: LECG, LLC v. The Seneca Nation of Indians: A JAMS Arbitration Ref. no. 1420015562* (hereinafter, "*Johnson Letter*"), *Kanji Stay Dec.* at Att. 20, the Nation initiated an action in the Seneca Nation of Indians Peacemakers Court seeking to temporarily and permanently enjoin LECG and JAMS "from commencing, prosecuting, administering, carrying on, holding and/or determining any arbitration proceeding brought by LECG against the Nation." *See Complaint, January 23, 2006, CA# 0125-06-1, Seneca Nation of Indians vs. Judicial Arbitration & Mediation Services, Inc. (JAMS) and LECG, LLC* (hereinafter, "*Nation's Complaint*"), *Kanji Stay Dec.* at Att. 21.  The Nation based its claim for relief on, *inter alia*, the following allegations:

> (6) The Nation was not a party to the [letter agreement] and never authorized or consented to the inclusion in the [letter agreement] of any provision purportedly subjecting the Nation to binding arbitration of disputes, nor has the Nation ever consented to or authorized JAMS to exercise jurisdiction over any such disputes. (7) The Nation was not made aware of the terms of the [letter agreement] until LECG submitted to JAMS a demand for arbitration of a dispute regarding payments allegedly due to LECG and involving LECG's performance of its obligations.  (8) The Nation, as a sovereign, possesses immunity from lawsuits and/or arbitration proceedings.  (9)  Such immunity remains intact unless expressly waived by the Nation Council.  See *Civil Procedure Rules §2-108(b)*, providing

that the Nation's [waiver] cannot be implied.  (10) By retaining [Sheppard Mullin] as independent counsel and authorizing [the firm] to "retain qualified forensic auditors", the Nation did not expressly or even impliedly waive its sovereign immunity from arbitration proceedings or lawsuits commenced by the consultants retained by [Sheppard Mullin].

*Id.* at Att. 21, p.2.  In an order dated January 25, 2006, the Peacemakers Court granted the Nation's request for temporary injunctive relief.  *See Order to Show Cause, January 25, 2006, CA# 0125-06-1, Seneca Nation of Indians vs. Judicial Arbitration & Mediation Services, Inc. (JAMS) and LECG, LLC*, *Kanji Stay Dec.* at Att. 22.

The Court lifted its temporary restraining order when the parties agreed on February 9, 2006 to hold all judicial and arbitration proceedings in abeyance pending efforts to resolve the dispute.  *See Amended Order to Show Cause, February 14, 2006*, *CA# 0125-06-1, Seneca Nation of Indians vs. Judicial Arbitration & Mediation Services, Inc. (JAMS) and LECG, LLC*, *Kanji Stay Dec.* at Att. 23; *Letter from Thomas C. Brady to John F. Cambria dated February 7, 2006 Re: Seneca Nation of Indians v. JAMS and LECG, LLC*, *Kanji Stay Dec.* at Att. 24.  On July 24, 2006, after LECG informed the Nation that it would reinitiate arbitration and/or other legal proceedings against the Nation, see *Letter from John F. Cambria to Thomas C. Brady dated July 18, 2006 Re: LECG, LLC v. The Seneca Nation of Indians*, *Kanji Stay Dec.* at Att. 25, the Nation sought, and the Peacemakers Court entered, a Second Amended Order to Show Cause temporarily restraining LECG and JAMS from "commencing, prosecuting, administering, carrying on, holding and/or determining any arbitration proceeding" brought by LECG against the Nation.  *Second Amended Order to Show Cause, July 24, 2006, CA# 0125-06-1, Seneca Nation of Indians vs. Judicial Arbitration & Mediation Services, Inc. (JAMS) and LECG, LLC* (hereinafter, "*Second Amended Order to Show*

*Cause*"), *Kanji Stay Dec.* at Att. 26.[7]  That same day, LECG filed the instant action, raising precisely the same issues pending for the previous six months before the Peacemakers Court.  *See Complaint for Declaratory Relief*, Doc. No. 1 at ¶¶ 12-13, 21, 31, Prayer for Relief, and Exhibit 7.

One week later, in a letter dated August 1, 2006, LECG informed the Peacemakers Court that it did not recognize the jurisdiction of that court over it or over "any aspect of the dispute between LECG and Seneca Nation of Indians."  *Letter from John F. Cambria to the Honorable Norma Kennedy and the Honorable Margaret Abrams dated August 1, 2006* (hereinafter, "*Peacemakers Court Letter*"), *Kanji Stay Dec.* at Att. 27.  LECG further informed the Peacemakers Court that it would not appear for the previously scheduled preliminary injunction hearing "or on any further or adjourned date."  *Id.*. at Att. 27, pp.1-2.  LECG reiterated its position in a letter to that court dated August 11, 2006.  *See Letter from John F. Cambria to the Honorable Norma Kennedy and the Honorable Margaret Abrams dated August 11, 2006* (hereinafter, "*Second Peacemakers Court Letter*"), *Kanji Stay Dec.* at Att. 28.  Subsequently, in an order dated August 30, 2006, the Peacemakers Court noted LECG's threshold challenge to its jurisdiction and set a briefing schedule with respect to all jurisdictional issues.  *See Order, August 30, 2006, CA# 0125-06-1, Seneca Nation of Indians vs. Judicial Arbitration & Mediation Services, Inc. (JAMS) and LECG, LLC* (hereinafter, "*Order on*

---

[7] The Peacemakers Court directed the parties to appear on August 21, 2006 for a preliminary injunction hearing regarding the same.  *See Second Amended Order to Show Cause, Kanji Stay Dec.* at Att. 26.

*Briefing*"), *Kanji Stay Dec.* at Att. 29.[8]  On September 25, 2006, LECG again contacted

the Peacemakers Court to raise jurisdictional objections.  *See Letter from John F.*

*Cambria to the Honorable Norma Kennedy and the Honorable Margaret Abrams dated*

*September 25, 2006* (hereinafter, "*Third Peacemakers Court Letter*"), *Kanji Stay Dec.* at

Att. 30.  While arguing that the action before the Peacemakers Court was now moot "[i]n

light of LECG's position to hold all arbitration proceedings in abeyance until the federal

court issues a ruling in the declaraory judgment action . . . [,]" LECG "respectfully

declin[ed]" to submit a jurisdictional brief to that court.  *Id***.** at Att. 30, pp.1-2.

In response to LECG's lawsuit in this Court, the Nation's Council on August 12,

2006 passed a resolution expressly effecting a narrow waiver of the Nation's sovereign

immunity limited to LECG's claim for declaratory relief in this Court.  *See Resolution of*

*the Council of the Seneca Nation of Indians Re: To Authorize Legal Defense in Action by*

*LECG Against the Seneca Nation of Indians* (Aug. 12, 2006) (hereinafter, "*August*

*Resolution*"), Doc. No. 8.  The Council took this extraordinary action in order "to defend

against LECG's attempt to compel the Nation to participate in an arbitration to which the

Nation has not consented" and "to preserve the integrity, authority, and development of

the courts of the Seneca Nation of Indians by . . . asking the federal court to stay [this]

action in deference to the pending Peacemaker's Court action on the same subject matter

pursuant to the tribal exhaustion doctrine . . . ."  *Id.*  Having answered LECG's Amended

Complaint for Declaratory Relief, the Nation now moves to stay all proceedings in this

action pending the exhaustion of tribal court remedies.

---

[8] The Peacemakers Court directed the simultaneous exchange of opening jurisdictional
briefs on September 29, 2006, and the simultaneous exchange of reply briefs on or before
October 21, 2006.  *See Order on Briefing*, *Kanji Stay Dec.* at Att. 29.

**ARGUMENT**

I.     **THE TRIBAL COURT EXHAUSTION DOCTRINE AND ITS
       UNDERLYING POLICIES REQUIRE THAT LECG EXHAUST ITS
       REMEDIES IN THE COURTS OF THE SENECA NATION BEFORE
       THIS COURT PROCEEDS**

In *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9 (1987) and *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985), the Supreme Court announced the doctrine of tribal court exhaustion, which is designed to protect the integrity of tribal courts, vital as those courts are to the exercise of tribal self-government.  Pursuant to that doctrine, LECG may not, in this Court, challenge the jurisdiction of the Peacemakers Court or litigate the merits of the dispute already pending before that court until it first exhausts all remedies available in the Nation's courts regarding the same.

The federal courts have uniformly held that, under the exhaustion doctrine, a party may not circumvent or attack a tribal court's jurisdiction to determine the validity of an arbitration clause and purported waiver of tribal sovereign immunity by filing a duplicative federal court action.  Because this dispute strikes at the very heart of the Nation's self-determination – including LECG's efforts to pierce the Nation's sovereign immunity and the Council's exercise of legislative oversight over the economic development activities of the Nation's Gaming Companies – and hinges on questions of Nation law – including an alleged waiver of the Nation's sovereign immunity, the authority of an outside entity to waive such immunity on the Nation's behalf, and the interpretation of the Council's Resolution – it presents a classic case for application of the

exhaustion doctrine.  Accordingly, this Court should stay its hand until LECG exhausts

its remedies in the courts of the Seneca Nation.[9]

A.    The Tribal Court Exhaustion Doctrine Applies Here Where LECG Has Filed a
      Duplicative Federal Court Action Regarding the Validity of an Arbitration Clause
      and Purported Waiver of Tribal Sovereign Immunity

"Tribal courts play a vital role in tribal self-government, and the Federal

Government has consistently encouraged their development."  *Iowa Mut. Ins. Co. v.

LaPlante*, 480 U.S. 9, 14-15 (1987) (internal citation and footnote omitted).  "A federal

court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair

the authority of tribal courts."  *Id.*, 480 U.S. at 15 (citations omitted).  Accordingly, a

party may not attack or circumvent the jurisdiction of the tribal court in a collateral or

parallel federal court action unless and until it first exhausts all remedies available in

tribal court.  *See id.*, 480 U.S. at 16-17; *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of

Indians*, 471 U.S. 845, 856-57 (1985).[10]  In fact, the Eighth, Ninth, and Tenth Circuits

have all held that the exhaustion of tribal court remedies is required even when no tribal

court action is pending at the time a federal court action is filed.  *See, e.g., United States*

---

[9] As set forth in detail in section III below, the duration of such a stay would turn on the
Peacemakers Court's jurisdictional determination.  Under the exhaustion doctrine, if that
court were to conclude that it lacks jurisdiction over LECG or the subject matter of the
LECG-Nation dispute, this Court would then proceed to adjudicate the merits of the
dispute.  If, however, the Peacemakers Court were to conclude that it possesses
jurisdiction, then this Court should stay its hand until the Peacemakers Court adjudicated
the merits of the dispute.  After that court's adjudication on the merits, and LECG's
exhaustion of the appellate remedies available in the courts of the Seneca Nation, this
Court would then proceed to review the jurisdictional determination of the Nation's
courts.  If this Court upheld the jurisdictional determination under federal law, then it
would not readjudicate the merits.  If, however, this Court found that the Nation's courts
acted without jurisdiction, it would then adjudicate the merits of the dispute.

[10] The exhaustion doctrine applies regardless of whether a party collaterally attacks the
jurisdiction of a tribal court directly, see *Nat'l Farmers*, 471 U.S. at 856-57, or indirectly
by seeking to litigate the merits of a dispute already before a tribal court, see *Iowa Mut.*,
480 U.S. at 11-13, 16-17.

*v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996); *Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation*, 27 F.3d 1294, 1296, 1299-1301 (8th Cir. 1994); *Burlington Northern R.R. Co. v. Crow Tribal Council,* 940 F.2d 1239, 1246-47 (9th Cir. 1991); *see also Drumm v. Brown*, 716 A.2d 50, 66-67 (Conn. 1998) (exhaustion required when parallel tribal court action filed after state court action because "[t]he order in which the filings take place . . . is generally immaterial to the policy concerns that animate the doctrine").

While the exhaustion of tribal court remedies is "required as a matter of comity, not as a jurisdictional prerequisite[,]" *Iowa Mut.*, 480 U.S. at 16 n.8, the doctrine is a mandatory "inflexible bar" to a federal court's exercise of jurisdiction.  *Bowen v. Doyle*, 230 F.3d 525, 529-30 (2d Cir. 2000) (quoting *Granberry v. Greer*, 481 U.S. 129, 131 (1987)); *see also, e.g.*, *Burlington Northern R.R. Co.*, 940 F.2d at 1245 (affirming mandatory nature of exhaustion requirement).  Further, because the "federal policy of promoting tribal self-government encompasses the development of the entire tribal court system . . . ," "[a]t a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts[,]" *Iowa Mut.*, 480 U.S. at 16-17,  and a federal court must "stay[] its hand" until tribal appellate review is complete, *Nat'l Farmers*, 471 U.S. at 857.  Following the exhaustion of tribal court remedies, the tribal courts' determination of tribal jurisdiction is subject to challenge in federal court – until then, "it would be premature for a federal court to consider any relief." *Id.*; *see also Iowa Mut.*, 480 U.S. at 19.

To the Nation's knowledge, the federal courts have arrived at complete unanimity on the precise question presented here.  With the exception of occasional district court

opinions that have been overturned on appeal, the federal courts have uniformly held that

the exhaustion doctrine precludes a party such as LECG from litigating in federal court

the validity of an arbitration clause and purported waiver of sovereign immunity when

those very same issues are pending in a parallel tribal court action.  For example, in

*Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840 (8th

Cir. 2003), the Eighth Circuit considered a dispute stemming from a casino management

agreement between Gaming World and the White Earth Band of Chippewa Indians.  The

dispute arose when the tribal council terminated the agreement and Gaming World

initiated arbitration proceedings pursuant to it.  *Gaming World*, 317 F.3d at 846-47.[11]

The Band subsequently sued Gaming World in tribal court, seeking *inter alia* a

declaration that the management agreement was invalid.  *Id.* at 846.  Gaming World

objected to tribal court jurisdiction and, one month later, sued the Band in federal court,

seeking a declaratory judgment as to the validity of the agreement and an order

compelling arbitration.  *Id.*  Recognizing that "[t]he first filed declaratory action [in tribal

court] encompasses all of the issues between the parties . . . [and that] Gaming World's

subsequent petition for declaratory relief and arbitration was a clear attempt to evade

tribal court jurisdiction," the Eighth Circuit held:

> [T]he district court erred by not deferring for exhaustion of tribal court remedies
> and by proceeding to rule on the motion to compel arbitration.  *Our decision in
> [Bruce H. Lien Co. v. Three Affiliated Tribes, 93 F.3d 1412 (8th Cir. 1996)] and
> those in similar cases decided by the Fifth, Ninth, and Second Circuits teach that
> exhaustion should be required when a party tries to avoid tribal court jurisdiction*

---

[11] The arbitration clause provided, "Any dispute, controversy or question of interpretation
arising under, out of, or in connection with this Agreement or any amendments hereof, or
any breach or default hereunder, shall be submitted to and determined and settled by
arbitration in the State of Minnesota, in accordance with the applicable rules of the
American Arbitration Association then in effect." *Gaming World Int'l, Ltd. v. White
Earth Band of Chippewa Indians*, 317 F.3d 840, 843 (8th Cir. 2003).

> *by seeking an order to compel arbitration in federal court.* This is especially true if
> the underlying dispute involves activities undertaken by tribal government within
> reservation lands. Failure to require exhaustion in these circumstances would
> undermine the important federal policy to foster tribal self government through the
> development of tribal courts as enunciated in *Nat'l Farmers Union Ins. Co.* and
> *Iowa Mut. Ins. Co.*

*Id.* at 851-52 (italics added) (footnote omitted).

The Eighth Circuit also confronted facts analogous to those before this Court in

*Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412 (8th Cir. 1996). There, the

Chairman and Secretary of the Three Affiliated Tribes Tribal Business Council,

purportedly acting on behalf of the Tribes, executed a gaming management agreement

with the Bruce H. Lien Company that included an arbitration clause and corresponding

waiver of sovereign immunity.  *Bruce H. Lien*, 93 F.3d at 1414-15 & n.2.  When the

company demanded arbitration, the Tribes sued in tribal court seeking a ruling that the

management agreement was "null and void under Tribal law due to lack of proper

authority and failure to garner approval by the [Tribal Business Council]."  *Id.* at 1415-

16.  After the Tribes obtained a preliminary injunction from the tribal court enjoining the

company and the American Arbitration Association from proceeding with the arbitration,

the company filed suit in federal court seeking to enforce the arbitration clause.  *Id.* at

1416.  The Eighth Circuit concluded:

> [T]he Tribes are challenging the legal validity of the contract itself, specifically the
> actions of its former Chairman leading to the execution of the contract. This
> challenge to the document itself therefore calls into question all provisions
> contained therein (including provisions relating to arbitration, sovereign immunity,
> and federal district court jurisdiction). . . .  [T]he issue becomes where the decision
> regarding the contract's validity is to be made.  In the end we are convinced that the
> question must first be promptly addressed in the Tribal Court, subject to
> appropriate review by the District Court.

*Id.* at 1417.  The District Court for the Northern District of Iowa recently reached the same conclusion on nearly identical facts, holding that the tribal court must first adjudicate the authority of an individual to contract on a tribe's behalf.  *See Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of the Mississippi in Iowa*, 401 F. Supp. 2d 952, 961-62 (N.D. Iowa 2005).[12]

The Ninth Circuit also recognized the well-established rule in *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221 (9th Cir. 1989), where after the Tribes sued Stock West in tribal court, the company demanded arbitration of the dispute pursuant to clauses in the governing contracts.  873 F.2d at 1222, 1224 & n.4.  When the Tribes refused to arbitrate and the tribal court determined that it had jurisdiction over Stock West, Stock West filed an action in federal court seeking to compel arbitration and to enjoin further tribal court proceedings.  *Id.* at 1223-25.  The district court dismissed the action pursuant to the exhaustion doctrine and the Ninth Circuit affirmed, expressly rejecting the argument that the arbitration clauses foreclosed application of the doctrine:

> Stock West argues that the strong federal policy favoring arbitration, such as embodied in the Arbitration Act, 9 U.S.C. § 2, should overcome the policy of comity in favor of the tribal court. But Stock West does not argue that the Arbitration Act deprives the tribal court of jurisdiction. Furthermore, particularly since the validity of the arbitration clauses in the contracts are themselves in

---

[12] The district court reasoned:  "Before the arbitration clause in the Agreement can be enforced, a court must determine whether the Agreement is valid.  If Walker had authority to enter into the Agreement and it was validly formed, then, the court agrees that the arbitration clause should be enforced.  If, however, on the other hand, Walker was without authority to enter into the Agreement on behalf of the Tribe and the Agreement is found to be an invalid and unenforceable contract, the provisions of the contract, including the arbitration clause, cannot be enforced. . . .  [T]his court finds the dispute over the Agreement's validity must be determined by the Tribal Court . . . ."  401 F. Supp. 2d at 961-62.

dispute, Stock West's argument that the federal courts should not defer to the tribal court is weak.

*Id.* at 1228-30 & n.16.

Similarly, in *Bank One, N.A. v. Shumake*, 281 F.3d 507 (5th Cir. 2002), the Fifth Circuit rejected the argument that a contractual arbitration clause "waived any right to tribal exhaustion" and that the doctrine did not apply in cases arising under the Federal Arbitration Act ("FAA"). 281 F.3d at 510, 514-16. There, several members of the Mississippi Band of Choctaw Indians sued Bank One in tribal court in connection with credit cards provided by the company for the purchase of home satellite systems; Bank One then filed suit in federal court under the FAA, seeking to compel arbitration of the cardholders' claims under an arbitration agreement allegedly binding the parties. *Id.* at 509-10. The Fifth Circuit held that the FAA did not "reflect a congressional intent for federal courts to occupy the entire field of arbitration law," and thus, Bank One's reliance on the FAA could not "override the federal policy of deference to tribal courts." *Id.* at 514. The Fifth Circuit also firmly rejected the contention that the arbitration clause constituted a waiver of the exhaustion doctrine. *Id.* at 515-16. Thus, Bank One was bound to exhaust its tribal court remedies before a federal court could act. *Id.* at 516.

The First and Second Circuits likewise subscribe to the uniform position described above – that the exhaustion of tribal court remedies is mandatory in cases turning on the validity of an arbitration clause and a purported waiver of tribal sovereign immunity. *See Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 30-33 (1st Cir. 2000) (tribal court exhaustion required with respect to interpretation and effect of arbitration and forum selection clause); *Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 63, 65-68 (2d Cir. 1997) (plaintiffs must

exhaust remedies in tribal court action before asking federal court to compel arbitration); *see also Calumet Gaming Group-Kansas, Inc. v. Kickapoo Tribe of Kansas*, 987 F. Supp. 1321, 1328-30 (D. Kan. 1997) (after Tribe had obtained from tribal court temporary restraining order enjoining arbitration and plaintiff had thereafter filed federal action, federal court ordered plaintiff to exhaust tribal court remedies with respect to jurisdiction of tribal court and merits of underlying claims). While the courts of this Circuit have not yet had occasion to address the exhaustion doctrine under these or other circumstances, the Nation respectfully submits that the law is well-settled.

When LECG sought to arbitrate a dispute arising on the Nation's Territories, targeting the Nation's financial resources, and in disregard of the Nation's sovereign immunity – purporting to do so based on its own interpretation of the Council's Resolution – the Nation filed an appropriate action in the Peacemakers Court to determine if it had waived its sovereign immunity from any such arbitration action. *See Arbitration Demand, Kanji Stay Dec.* at Att. 15, pp.2-4; *LECG Arbitration Letter, Kanji Stay Dec.* at Att. 18, pp.2-3; *Nation's Complaint, Kanji Stay Dec.* at Att. 21. Six months later, LECG filed a plainly duplicative action in this Court, seeking a declaration that the boilerplate language in its commercial agreements effected a waiver of the Nation's immunity. *See Amended Complaint*, Doc. No. 6 at ¶ 34, and Prayer for Relief. Concurrently, LECG has informed the Peacemakers Court that it contests the jurisdiction of that court over it and the subject matter of the dispute, but will make no appearance to present those jurisdictional arguments. *See Peacemakers Court Letter, Kanji Stay Dec.* at Att. 27; *Second Peacemakers Court Letter, Kanji Stay Dec.* at Att. 28; *Third Peacemakers Court Letter, Kanji Stay Dec.* at Att. 30. The tribal court exhaustion

doctrine unquestionably bars LECG's transparent attempt to circumvent the jurisdiction of the courts of the Seneca Nation. Accordingly, this Court should not proceed further in this action until LECG fully exhausts its remedies in the courts of the Seneca Nation.

Despite making the telling concession that this action and the previously-filed Peacemakers Court action are "duplicative and over-lapping," see *Third Peacemakers Court Letter*, *Kanji Stay Dec.* at Att. 30, p.2 – a concession dispositive of LECG's obligation to exhaust its remedies in the courts of the Seneca Nation – LECG nonetheless suggests that the latter action is moot because LECG has voluntarily agreed to hold the arbitration in abeyance pending the outcome of the action before this Court. *See id.* at Att. 30, p.1. Mootness, however, is a jurisdictional challenge, see, e.g., *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."), and therefore falls squarely within the scope of the exhaustion doctrine. Accordingly, LECG must present that challenge to the Peacemakers Court in the first instance.

Moreover, LECG is patently incorrect when it states that "there is no claim for relief pending" in the Peacemakers Court action, thereby rendering it moot. *Third Peacemakers Court Letter*, *Kanji Stay Dec.* at Att. 30, p.2. First, and most obviously, the Nation seeks in that action permanent, not merely preliminary, injunctive relief with respect to LECG's attempt to arbitrate its dispute with the Nation. *See Nation's Complaint*, *Kanji Stay Dec.* at Att. 21, p.2. LECG, in fact, seeks in this action permanent relief of the same nature. *See Amended Complaint*, Doc. No. 6 at Prayer for Relief, sub¶¶ 2-3 (praying for judgment that Nation "is subject to the arbitral forum and jurisdiction of

JAMS" and that "the arbitration proceeding commenced by LECG before JAMS . . . should proceed, and the Arbitrator appointed therein shall decide the merits of the dispute between the parties").

Second, inherent in the Nation's request for injunctive relief is a request for declaratory relief, which is precisely what LECG seeks from this Court. The Nation bases its claim for relief in the Peacemakers Court on, *inter alia*, the following allegations:

> (6) The Nation was not a party to the [letter agreement] and never authorized or consented to the inclusion in the [letter agreement] of any provision purportedly subjecting the Nation to binding arbitration of disputes, nor has the Nation ever consented to or authorized JAMS to exercise jurisdiction over any such disputes. (7) The Nation was not made aware of the terms of the [letter agreement] until LECG submitted to JAMS a demand for arbitration of a dispute regarding payments allegedly due to LECG and involving LECG's performance of its obligations. (8) The Nation, as a sovereign, possesses immunity from lawsuits and/or arbitration proceedings. (9) Such immunity remains intact unless expressly waived by the Nation Council. See *Civil Procedure Rules §2-108(b)*, providing that the Nation's [waiver] cannot be implied. (10) By retaining [Sheppard Mullin] as independent counsel and authorizing [the firm] to "retain qualified forensic auditors", the Nation did not expressly or even impliedly waive its sovereign immunity from arbitration proceedings or lawsuits commenced by the consultants retained by [Sheppard Mullin.]

*Nation's Complaint, Kanji Stay Dec.* at Att. 21, p.2. The clear prerequisite to any final ruling from the Peacemakers Court on the Nation's request for injunctive relief is a declaration as to the rights and legal relations of the parties with respect to the waiver of sovereign immunity alleged by LECG and the Nation's obligation to arbitrate its dispute with LECG. These are precisely the same questions that LECG has placed before this Court, see *Amended Complaint*, Doc. No. 6 at ¶¶ 12-13, 21, 31, and Prayer for Relief, and "declaratory relief alone [would have] virtually the same practical impact as a formal injunction would." *Samuels v. Mackell*, 401 U.S. 66, 72 (1971). Thus, so long as LECG

ultimately seeks to pierce the Nation's sovereign immunity and to compel the Nation to arbitrate the underlying dispute between the parties, LECG's representations regarding its short-term litigation strategy cannot unilaterally moot the very live controversy pending before the Peacemakers Court and certainly do not excuse application of the exhaustion doctrine here.

B.    Exhaustion in This Dispute – a Quintessential Tribal Affair Stemming from the Nation's Exercise of Self-Government and Turning on the Interpretation of Tribal Law – Fulfills the Policies Underlying the Exhaustion Doctrine

The policies underlying the exhaustion doctrine underscore the importance of its application to this dispute. In addition to promoting the substantive federal policies of tribal self-government, self-determination, and the authority and development of tribal courts, the tribal court exhaustion doctrine advances several prudential policies. *See Iowa Mut.*, 480 U.S. at 14-17; *Nat'l Farmers*, 471 U.S. at 856-57. Judicial efficiency, the "orderly administration of justice", and the avoidance of "procedural nightmare[s]" demand that a tribal court be afforded full opportunity to determine its jurisdiction, evaluate any challenges thereto, rectify any errors, and develop a full record before a federal court intervenes. *Id.* at 856-57. Moreover, exhaustion encourages tribal courts "to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review." *Id.* at 857 (footnote omitted).

By contrast, allowing litigants to evade proper exercises of tribal court authority through the filing of duplicative actions in other courts would sap tribal courts of their authority and undermine tribal self-government:

[U]nconditional access to the federal forum *would place it in direct competition with the tribal courts,* thereby impairing the latter's authority over reservation

affairs.  Adjudication of such matters by any nontribal court also infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law.

*Iowa Mut.*, 480 U.S. at 16 (italics added) (citations omitted).  As the Second Circuit has further explained:

> The Supreme Court has long recognized the exclusive responsibility of Native American tribes to construe their own law, and with that responsibility comes the parallel responsibility of federal courts to abide by those constructions.  Federal courts, as a general matter, lack competence to decide matters of tribal law and for us to do so offends notions of comity underscored in *National Farmers*.

*Basil Cook,* 117 F.3d at 66 (citations omitted).  The importance of the exhaustion doctrine has accordingly been affirmed in numerous cases.  *See, e.g.*, *Ninigret Dev. Corp.*, 207 F.3d at 32-33 ("[H]aving a tribal court address, in the first instance, the scope of its jurisdiction over a dispute that stems from actions taken in the course of tribal governance promotes efficiency and sensibly allocates scarce judicial resources."); *Calumet Gaming Group-Kansas, Inc.*, 987 F. Supp. at 1329 ("If exhaustion is not required, the legitimacy and independence of the tribal court system come into serious question.  Allowing litigants to bypass tribal institutions by filing an action in federal court would undercut the tribal court system.").

The federal courts have therefore not hesitated to require exhaustion in cases implicating these policies.  *See, e.g.*, *Basil Cook*, 117 F.3d at 66-68 (contract dispute over disposition of tribal resources and challenge to constitutional authority of tribal court and qualifications of tribal court judge); *Duncan Energy Co. v. Three Affiliated Tribes of the Fort Berthold Reservation*, 27 F.3d 1294, 1300 (8th Cir. 1994) (dispute over tribal taxation and employment rights); *A & A Concrete, Inc. v. White Mountain Apache Tribe*, 781 F.2d 1411, 1416 (9th Cir. 1986) (claims hinge upon interpretation of tribal code and

24

tribal legislature's intent); *Navajo Nation v. Intermountain Steel Bldgs., Inc.*, 42 F. Supp. 2d 1222, 1229 (D.N.M. 1999) (case turning on tribal law and custom of insurance, contract, and tort); *Calumet Gaming Group-Kansas*, 987 F. Supp. at 1329 (dispute over performance of contracts relating to on-reservation gaming operation). "Federal court restraint is 'especially appropriate' where the issues between the parties grow out of '[t]ribal governmental activity involving a project located within the borders of the reservation.'" *Gaming World*, 317 F.3d at 850 (quoting *Bruce H. Lien*, 93 F.3d at 1420). For example, "[c]ourts regularly have held that a contract dispute between a tribe and an entity doing business with it, concerning the disposition of tribal resources, is a tribal affair for purposes of the exhaustion doctrine." *Ninigret Dev. Corp.,* 207 F.3d at 32.

Disputes such as the present one between the Nation and LECG go to the heart of tribal self-government, self-determination, and the disposition of tribal resources. The question whether the Nation waived its sovereign immunity (or delegated the authority to effect such a waiver) by authorizing the Independent Counsel investigation that took place on the Nation's Territories is a quintessential question of Nation law that properly should be addressed by the Nation's courts if they conclude that they have jurisdiction over this matter. It is much like the question at issue in *Bruce H. Lien*, discussed *supra*, where the Eighth Circuit characterized the dispute as a reservation affair and required exhaustion because the validity of the contract turned on the interpretation of tribal law -- specifically, the authority of the Chairman and Secretary of the Tribal Business Council to contractually bind the Tribes and to waive sovereign immunity without the Council's approval. 93 F.3d at 1414 & n.2, 1420-21. Similarly, in *Attorney's Process & Investigation Servs., Inc.*, the district court required exhaustion in a case turning on the

authority of a tribal official to contract on behalf of a tribe and to commit the tribe to

binding arbitration:

> This court is without jurisdiction to determine whether the Walker Council or the
> Bear Council was the governing body of the Tribe at the time the Agreement was
> signed . . . .  [T]his court finds the dispute over the Agreement's validity must be
> determined by the Tribal Court because the issue of whether Walker had authority
> to enter into the Agreement with API is at the heart of an intra-tribal dispute.

401 F. Supp. 2d at 961-62.  *See also Stock West Corp. v. Taylor*, 964 F.2d 912, 920 (9th

Cir. 1992) (exhaustion required because "[w]hether [the tribal statute extending sovereign

immunity to tribal officers and employees] protects Mr. Taylor, who is a non-Indian,

from suit for his work as counsel for two tribal corporations is a matter that requires an

interpretation of legislative intent that should be conducted in the first instance by the

Colville tribal courts"); *Burlington Northern R.R. Co.*, 940 F.2d at 1246 ("As in *National

Farmers Union,* an initial exercise of tribal jurisdiction not only would bolster tribal self-

government, but also would provide any subsequently reviewing federal court with

authoritative interpretation of the ordinance. Had the federal district court proceeded

further in this case, on the other hand, it would have interpreted the disputed ordinance

and ruled on tribal jurisdiction before tribal authorities themselves had a chance to

declare what tribal law means."); *Snowbird Const. Co. v. United States*, 666 F. Supp.

1437, 1444 & n.4 (D. Idaho 1987) (exhaustion required where power of tribal housing

authority to consent to state court jurisdiction hinged upon interpretation of tribal code

and tribal ordinance).

   This dispute arises from the efforts of the Nation's Council to obtain a

confidential independent assessment of the Nation's Gaming Companies, which are

wholly-owned by the Nation and organized under Nation law, and of the construction,

financing, operation, and management of the Nation gaming facilities, which are "of vital importance to the economy of the Nation and the general welfare of Seneca People[.]" *Resolution*, *Kanji Stay Dec.* at Att. 1, pp.1-2.   Acting on behalf of the Seneca People, the duly-elected Council sought "to determine whether all financial transactions [conducted by or on behalf of the Gaming Companies] were *inter alia* conducted at arm's length, in the best interests of the Nation, in accordance with the [Gaming Companies'] fiduciary and other responsibilities to the Nation, free of any conflicts of interest, and in conformity with all applicable and pertinent laws." *Id.* at Att. 1, p.2.  By formal resolution, the Council appointed Independent Counsel to conduct this investigation. *Id.* at Att. 1, p.2. Pursuant to the authority granted in that Resolution, Sheppard Mullin retained LECG and LECG repeatedly entered the Nation Territories to conduct interviews, review documents and data, meet with Council members, preserve and collect data, perform computer forensics activities, image computer hard drives, and present its data and findings to the Council. *See, e.g., Invoice #40915*, *Kanji Stay Dec.* at Att. 3, p.3; *Invoice #42199*, *Kanji Stay Dec.* at Att. 8, pp.4-11; *Invoice #44832*, *Kanji Stay Dec.* at Att. 5, pp.4-5.  LECG now wields the Resolution as authority for Sheppard Mullin to waive the Nation's sovereign immunity without the Nation's knowledge or consent.

By filing a federal action duplicative of the Peacemakers Court action, LECG has sought to place this Court and the Peacemakers Court on the very "collision course" that the exhaustion doctrine forbids. *Ninigret Dev. Corp.,* 207 F.3d at 33.  Without question, LECG's tack offends the policies of judicial efficiency, the orderly administration of justice, tribal-court development, and tribal law-making authority set forth by the Supreme Court in *Iowa Mut.* and *Nat'l Farmers*.  Therefore, and in keeping with the

numerous decisions set forth above, the exhaustion doctrine and the important policies underpinning it dictate that the courts of the Seneca Nation must have the first opportunity to address this quintessential tribal affair.

## II.    THE EXCEPTIONS TO THE EXHAUSTION DOCTRINE DO NOT EXCUSE ITS MANDATORY APPLICATION HERE

In *Nat'l Farmers Union*, the Supreme Court articulated three exceptions to the requirements of the exhaustion doctrine:

> We do not suggest that exhaustion would be required where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

471 U.S. at 856 n.21 (internal citation omitted).  In *Strate v. A-I Contractors*, 520 U.S. 438 (1997), the Supreme Court added that the exhaustion doctrine also "must give way" and "would serve no purpose other than delay" when "it is plain" that the tribal court lacks jurisdiction as a matter of federal law.  520 U.S. at 459 n.14.  It is patently clear, however, that none of these exceptions applies here.

With respect to the first exception (bad faith or harassment), six months before LECG filed the instant action, the Nation asked the Peacemakers Court for a determination that LECG's boilerplate arbitration language, attached to an agreement entered between Sheppard Mullin and LECG, could not operate to waive the Nation's sovereign immunity, and for an injunction barring LECG from proceeding with any such arbitration.  *See Nation's Complaint*, *Kanji Stay Dec.* at Att. 21  At that time, LECG had initiated an arbitration proceeding before JAMS and expressed its intent to move forward with that arbitration in the Nation's absence.  *Arbitration Demand*, *Kanji Stay Dec.* at Att. 15, pp.1-4; *Johnson Letter*, *Kanji Stay Dec.* at Att. 20; *Edmonds Email*, *Kanji Stay Dec.*

at Att. 19; *Porter Letter to JAMS, Kanji Stay Dec.* at Att. 17. The Nation's decision to

seek judicial relief from the courts of the Seneca Nation to protect its sovereign immunity

and to obtain a ruling on the meaning and ramifications of the Resolution in connection

with a dispute arising out of LECG's activities on the Nation's Territories cannot

reasonably be viewed as an exercise in bad faith or harassment.

Under the second exception, exhaustion is not required when a federal law

expressly vests jurisdiction over a dispute in the federal courts to the exclusion of other

forums. *See, e.g., El Paso Natural Gas v. Neztsosie*, 526 U.S. 473, 483-87 (1999) (Price-

Anderson Act); *Blue Legs v. United States Bureau of Indian Affairs*, 867 F.2d 1094,

1097-98 (8th Cir. 1989) (Resource Conservation and Recovery Act). Here, LECG has

sought relief from this Court under the Declaratory Judgment Act, see Doc. No. 6 at ¶¶ 7,

31-35, which provides that a district court "*may* declare the rights and other legal

relations of any interested party seeking such declaration[.]" 28 U.S.C. § 2201 (italics

added). However, because this Act confers "'unique and substantial discretion in

deciding whether to declare the rights of litigants'" rather than an "'absolute right upon

the litigant[,]'" a court's willingness to award such relief must "yield to the applicability

of the tribal exhaustion doctrine." *Malaterre v. Amerind Risk Mgmt.*, 373 F. Supp. 2d

980, 981-82 (D.N.D. 2005) (quoting in part *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-

87 (1995)). Indeed, as discussed at length above, courts have routinely enforced the

exhaustion doctrine in declaratory judgment actions seeking determinations as to the

enforceability of arbitration clauses against tribes. *See, e.g., Gaming World*, 317 F.3d at

847-48; *Malaterre*, 373 F. Supp. 2d at 981-82. By the same token, even if LECG had

sought to invoke the FAA in this action, which it has not and could not, neither the FAA

nor any general federal policy supporting arbitration excuses application of the exhaustion doctrine. *See Bank One,* 281 F.3d at 510-14; *Stock West, Inc.*, 873 F.2d at 1228 n.16; *Calumet Gaming Group-Kansas, Inc.*, 987 F. Supp. at 1328.[13]

Nor may LECG claim under the third exception that exhaustion would be futile due to any inability to challenge the Peacemakers Court's jurisdiction. "As long as a tribal forum is arguably in existence, as a general matter, [the federal court] [is] bound by *National Farmers* to defer to it." *Basil Cook,* 117 F.3d at 66. Thus, if "the availability of a remedy at tribal law is facially apparent[,]" – for example, if the tribal constitution provides for judicial recourse, encompassing a trial and an appeal – federal plaintiffs "must direct their arguments to the Tribal Court in the first instance." *Id.* Here, the Seneca Nation of Indians has a fully functioning and vital court system. Proceedings before its Peacemakers Court are governed by a comprehensive set of rules, see The Seneca Nation of Indians Peacemakers Court and Surrogates Court Civil Procedure Rules, which are designed to ensure the orderly and impartial administration of justice, and litigants enjoy a constitutional right of appeal from the determinations of that court pursuant to the Constitution of the Seneca Nation of Indians of 1848, as amended. The Peacemakers Court has already issued a briefing schedule regarding the question whether it may exercise jurisdiction over the dispute between LECG and the Nation. *See Order on Briefing*, *Kanji Stay Dec.* at Att. 29. While LECG may apparently choose not to avail itself of the procedures and protections being afforded it by the Nation's courts, see, e.g.,

---

[13] A federal court only has jurisdiction over a Federal Arbitration Act claim to compel arbitration if the court would have jurisdiction over the underlying contract claim. *See* 9 U.S.C. § 4 (2006). Because the Nation is not a citizen for diversity purposes, see *American Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1094-95 (9th Cir. 2002), and because LECG's underlying claim for breach of contract presents no federal question, this Court would not have jurisdiction over such a claim.

*Peacemakers Court Letter*, *Kanji Stay Dec.* at Att. 27 and *Third Peacemakers Court Letter*, *Kanji Stay Dec.* at Att. 30, that decision cannot operate to undermine the application of the exhaustion doctrine. *See Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir. 1992); *see also A & A Concrete, Inc.*, 781 F.2d at 1416-17 (holding that alleged potential for bias in tribal forum does not excuse failure to exhaust); *Williams-Willis v. Carmel Fin. Corp.*, 139 F. Supp. 2d 773, 780-81 (S.D. Miss. 2001) (same).

Finally, while the Supreme Court noted in *Strate* that application of the exhaustion doctrine is not required where "it is plain" that tribal court jurisdiction is lacking as a matter of federal law, 520 U.S. at 459 n.14, such is clearly not the case here. While an exhaustive jurisdictional analysis at this juncture would be premature and would contravene the fundamental purpose of the exhaustion doctrine – *see Petrogulf Corp. v. Arco Oil & Gas Co.*, 92 F. Supp. 2d 1111 , 1117 (D. Colo. 2000) ("By arguing that this case falls under neither of the *Montana* exceptions, Plaintiff addresses whether the tribal court has jurisdiction over this case, not whether the tribal court should be permitted to address that question *before* the case is brought in state or federal court. As the Supreme Court has stated, the questions are distinct.") (italics in original); *see also Attorney's Process & Investigation Servs., Inc.*, 401 F. Supp. 2d at 958; *Williams-Willis*, 139 F. Supp. 2d at 778-79 & n.5 – it is patently clear in this case that the Peacemakers Court has jurisdiction over the dispute between the Nation and LECG as a matter of federal law. The Supreme Court has referred to its decision in *Montana v. United States,* 450 U.S. 544, 565-66 (1981) as "the pathmarking case concerning tribal civil authority over nonmember[.]" *Strate*, 520 U.S. at 445. In *Montana*, the Court held that, at a

minimum, tribes may regulate the activity of nonmembers when they "enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," or when their conduct "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 565-66 (citations omitted).

Here, LECG plainly engaged in a commercial relationship with the Nation and its Gaming Companies that centered upon LECG's performance of forensic auditing services in the Nation's Territories in connection with the Nation's internal investigation of the Gaming Companies. *See Resolution*, *Kanji Stay Dec.* at Att. 1. Between December 2004 and April 2005, LECG's work repeatedly brought it onto the Nation's Territories, where it engaged in intensive interaction with the Nation and its Gaming Companies pursuant to the authority granted by the Council's Resolution. *See Amended Complaint*, Doc. No. 6 at ¶ 16; *Invoice #44832*, *Kanji Stay Dec.* at Att. 5, pp. 4-5; *Invoice #43727*, *Kanji Stay Dec.* at Att. 6, pp.4-5; *Invoice #42748*, *Kanji Stay Dec.* at Att. 7, pp.4-5; *Invoice #42199*, *Kanji Stay Dec.* at Att. 8, pp.4-11; *Invoice #41542, Kanji Stay Dec.* at Att. 9, pp.3-4. Over the course of three weeks in January 2005, for example, LECG's Principals, Experts, Managing Consultants, Senior Consultants, and Senior Managing Consultants entered the Nation's Territories to conduct interviews of officials of the Gaming Companies and others, meet with Council members, review financial and casino-construction documents and data held by the Gaming Companies, preserve and extract electronic data held by the Gaming Companies, perform computer forensics activities at the Nation's gaming sites, image the Gaming Companies' computer hard drives, and present their preliminary findings to the Nation's Council. *See Invoice #42199*, *Kanji*

*Stay Dec.* at Att. 8, pp.4-11, 15.  The dispute that LECG now seeks to arbitrate before

JAMS stems directly from LECG's activities in the Nation's Territories and its

presentation of grossly erroneous accounting information to the Nation's Council and to

the Seneca Gaming Corporation's Board of Directors and Audit Committee.  *See Porter*

*Letter*, *Kanji Stay Dec.* at Att. 14; *Howard Letter*, *Kanji Stay Dec.* at Att. 12; *Salomon*

*Letter*, *Kanji Stay Dec.* at Att. 13; *Amended Complaint*, Doc. No. 6 at ¶¶ 17-19.  Thus, the

Peacemakers Court's exercise of jurisdiction to adjudicate an important aspect of the

commercial relationship between the Nation and LECG – specifically, whether the

Council's Resolution authorized Sheppard Mullin to bind the Nation to arbitrate disputes

with LECG or to otherwise waive the Nation's sovereign immunity and whether the

Nation is bound by LECG's boilerplate arbitration clause – fits squarely within the

*Montana* framework.

It bears repeating that the uniform body of circuit court precedent mandating the

exhaustion of tribal court remedies in disputes hinging upon the validity of arbitration

clauses involves defendants who, like LECG, engaged in on-reservation commercial

relationships with tribes or their members.  *See, e.g., Gaming World*, 317 F.3d at 842,

846, 850-51; *Bank One*, 281 F.3d at 509-10; *Bruce H. Lien*, 93 F.3d at 1414-16; *Stock*

*West, Inc.*, 873 F.2d at 1222-24.  Likewise, the Supreme Court first announced the

exhaustion doctrine in two cases where the defendants in the tribal court actions were

nonmembers but the plaintiffs' claims arose from the defendants' on-reservation

activities.  *See Iowa Mut.*, 480 U.S. at 11-12 (defendant insurer of on-reservation

company owned by tribal members); *Nat'l Farmers*, 471 U.S. at 847 (defendant school

district operating on-reservation elementary school).  Thus, application of the exhaustion

doctrine is unquestionably mandated under the circumstances presented here.

### III.    THE COURT SHOULD STAY THIS ACTION UNTIL THE COURTS OF THE SENECA NATION EITHER DETERMINE THEY LACK JURISDICTION OVER THIS DISPUTE OR ADJUDICATE THE DISPUTE ON THE MERITS

Under the exhaustion doctrine, this Court should "stay its hand until after the

Tribal Court has had a full opportunity to determine its own jurisdiction."  *Nat'l Farmers*,

471 U.S. at 857.  The Peacemakers Court has already called for briefs addressing its

jurisdiction over LECG and the subject matter of the Nation's action.  *See Order on*

*Briefing*, *Kanji Stay Dec.* at Att. 29.  In the event the Peacemakers Court concludes it

possesses jurisdiction, the Supreme Court has outlined the downstream sequence and

parameters of judicial review:

> If the Tribal Appeals Court upholds the lower court's determination that the tribal
> courts have jurisdiction, petitioner may challenge that ruling in the District Court.
> Unless a federal court determines that the Tribal Court lacked jurisdiction,
> however, *proper deference to the tribal court system precludes relitigation of*
> *issues raised by the [underlying] claim and resolved* in the Tribal Courts.

*Iowa Mut.*, 480 U.S. at 19 (citation omitted) (italics added).  If the Peacemakers Court

upholds its jurisdiction, then, it should proceed to adjudicate the merits of the Nation's

underlying claim, and the Nation's appellate processes should be exhausted, before

LECG may challenge the jurisdictional determination in this Court.  *See, e.g., Stock West,*

*Inc.*, 873 F.2d at 1227-28; *Calumet Gaming Group-Kansas, Inc.*, 987 F. Supp. at 1328-

29.[14]

_____

[14] Following exhaustion, in making its jurisdictional determination a district court should
review the tribal court's finding of facts under a deferential, clearly erroneous standard,
while reviewing legal determinations under a *de novo* standard.  *See Mustang Prod. Co.*
*v. Harrison*, 94 F.3d 1382, 1384 (10th Cir. 1996); *Duncan Energy Co. v. Three Affiliated*

Further, if this Court subsequently upholds an affirmative jurisdictional determination by the Nation's courts, it should not then readjudicate the merits of the underlying dispute. *See, e.g.*, *AT&T Corp. v. Coeur D'Alene Tribe*, 295 F.3d 899, 903-04 (9th Cir. 2002); *Davis v. Mille Lacs Band of Chippewa Indians*, 193 F.3d 990, 991-92 (8th Cir. 1999); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 999 F.2d 503, 508 n.12 (11th Cir. 1993). As the First Circuit succinctly summarized the exhaustion procedure in *Ninigret Dev. Corp.*:

> [A]s a matter of comity, it is for the tribal court, in the first instance, (a) to determine the contours of its own jurisdiction . . . and if it determines that it has the authority to proceed, (b) to effectuate its jurisdictional determination by adjudicating the merits of the appellant's claims. . . . Should the case return to the federal court, all preserved jurisdictional issues . . . are subject to plenary district court review. Nevertheless, as long as the tribal court has properly defined its own jurisdiction, respect for the tribal court system will bar the relitigation of merits-related issues that were presented to and decided by that court.

207 F.3d at 35 (citations omitted). Accordingly, a party must exhaust its tribal court remedies with respect to the underlying claims as well as the threshold question of jurisdiction. *See Calumet Gaming Group-Kansas, Inc.*, 987 F. Supp. at 1328-29 (summarizing Tenth Circuit case law). The failure to do so precludes the federal plaintiff from challenging in federal court even the jurisdictional determination of the tribal court, let alone its decision on the merits of the underlying claim. *See Davis*, 193 F.3d at 991-92; *see also White v. Pueblo of San Juan*, 728 F.2d 1307, 1312-13 (10th Cir. 1984) (failure to exhaust tribal remedies bars federal civil rights action).

While it is within a district court's discretion to stay or dismiss an action pending the exhaustion of tribal remedies, *Nat'l Farmers*, 471 U.S. at 857, a stay is the preferred

---

*Tribes of Fort Berthold Reservation*, 27 F.3d 1294, 1300 (8th Cir. 1994); *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313-14 (9th Cir. 1990).

course in cases where a plaintiff files a duplicative federal court action seeking a

determination as to the validity of an arbitration clause. *See, e.g., Bruce H. Lien*, 93 F.3d

at 1419, 1422 (in action to compel arbitration, district could should have stayed

proceedings pending a resolution in tribal court of validity of contract and arbitration

clause); *Basil Cook Enters. v. St. Regis Mohawk Tribe*, 914 F. Supp. 839, 842 (N.D.N.Y.

1996) (staying federal action seeking to compel arbitration under contract pending tribal

court resolution of jurisdiction and validity of contract), *aff'd*, 117 F.3d 61 (2d Cir. 1997);

*Calumet Gaming Group-Kansas, Inc.*, 987 F. Supp. at 1324, 1330-31 (staying federal

court action challenging tribal jurisdiction until plaintiff exhausts remedies in tribal court

action seeking declaration that contract is invalid and injunction enjoining arbitration

proceedings). The Tenth Circuit has indeed expressed a "general preference" for

issuance of a stay in all exhaustion cases. *See id.* at 1330 (quotations and citations

omitted).

A stay is indeed the most appropriate and prudent course of action here. LECG

has invoked this Court's jurisdiction, and the Nation has answered LECG's Amended

Complaint. The Nation's Council has taken the extraordinary step of waiving the

Nation's sovereign immunity from this declaratory judgment action in an effort to protect

the integrity of the courts of the Seneca Nation and the orderly administration of justice.

*See August Resolution*, Doc. No. 8. The Nation seeks to ensure that no additional forums,

including JAMS, become further embroiled in either this dispute (as to the validity of the

arbitration clause and purported waiver of sovereign immunity) or the underlying dispute

(regarding sums allegedly owed under the letter agreement) until a final judicial

determination is made with respect to the threshold question of the Nation's sovereign

immunity.  Because both the Nation and LECG have now sought judicial resolution of

that question, it is appropriate for this Court to retain jurisdiction to review the

jurisdictional determination of the Peacemakers Court following LECG's exhaustion of

tribal court remedies.  Accordingly, the Nation respectfully requests that the Court stay

this action pending LECG's exhaustion of remedies in the courts of the Seneca Nation.[15]

## CONCLUSION

The Nation has been unwavering in its position – because it never reviewed,

approved, or signed the letter agreement entered between Sheppard Mullin and LECG,

and because the Resolution authorizing Sheppard Mullin to retain forensic auditing

services did not authorize Sheppard Mullin to consent to arbitration on behalf of the

Nation or to otherwise waive the Nation's sovereign immunity – the Nation is not bound

to arbitrate a dispute with LECG arising from the governmental and commercial activities

of the Nation and LECG on the Nation's Territories.  That singular question is now

pending in parallel actions before two courts.  Pursuant to the well-established doctrine of

tribal court exhaustion, the Nation respectfully requests that the Court stay this action

until the courts of the Seneca Nation have had a full and fair opportunity to determine

their jurisdiction over the dispute, and if they uphold that jurisdiction, to adjudicate the

merits of this Nation affair.

---

[15] In the event the Court chooses instead to dismiss this action, the Nation asks the Court
to exercise its equitable powers and to enter an order enjoining LECG from taking any
action to advance an arbitration proceeding against the Nation unless and until either a
Seneca Nation court or a federal court enters a final judgment that the Nation is bound by
the LECG boilerplate arbitration clause.

Respectfully submitted this 3rd day of October, 2006.


KANJI & KATZEN, PLLC

/s/ Riyaz A. Kanji_____

Robert Odawi Porter                    Riyaz A. Kanji (D.C. Bar No. 455165)
Senior Policy Advisor and Counsel      Kanji & Katzen, PLLC
Christopher Karns                      101 North Main Street
Deputy Counsel                         Suite 555
Seneca Nation of Indians               Ann Arbor, Michigan 48104
Post Office Box 231, Seneca Nation     Ph:   (734)-769-5400
Salamanca, New York 14779              Fax: (734)-769-2701
Ph:   (716) 945-1790                   Email:  rkanji@kanjikatzen.com
Fax: (716) 945-6869

                                       Phillip E. Katzen
                                       Cory Albright
                                       KANJI & KATZEN, PLLC
                                       100 South King Street, Suite 560
                                       Seattle, Washington 98104
                                       Ph:   (206) 344-8100

                                       *Counsel for Seneca Nation of Indians*