**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LECG, LLC | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    Civil Case No.  1:06CV01303 (RCL) |
| THE SENECA NATION OF INDIANS | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION
TO STAY AND IN SUPPORT OF PLAINTIFF LECG, LLC'S
<u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

Plaintiff LECG, LLC ("Plaintiff" or "LECG"), by and through its undersigned counsel,

opposes the Motion to Stay of Defendant The Seneca Nation of Indians' ("Defendant" or

"Seneca") and moves this Court, pursuant to Fed. R. Civ. Pro. 12(c), for judgment on the

pleadings.  The facts established by the pleadings and admitted in Defendant's Motion to Stay

show that (1) Seneca undeniably waived its sovereign immunity by expressly agreeing in its

contract with LECG to arbitrate any disputes under the auspices of the Judicial Arbitration &

Mediation Services, Inc. ("JAMS"), and to allow "any State or Federal Court having jurisdiction

thereof" to enter judgment on the arbitration award; and (2) the tribal exhaustion doctrine does

not apply because (i) the resolution of this dispute does not involve tribal law or tribal affairs, (ii)

it would be futile to proceed in tribal court since both sides have recognized this Court's

jurisdiction to adjudicate the <u>sole</u> legal issue and proceeding in tribal court will inevitably

involve wasteful litigation of issues that are not necessary to decide, and (iii) Seneca has

proceeded in bad faith by attempting to use its tribal court to delay and frustrate adjudication of

that sole legal issue.  LECG therefore respectfully requests that this Court deny Defendant's

Motion to Stay and enter a declaratory judgment on its Complaint.

## STATEMENT OF FACTS

The following recitation of the facts is adopted from the pleadings and other admissions

made by Seneca and from documents attached to pleadings filed by the parties.  As will become

self-evident, the facts pertinent to the resolution of the instant motions are undisputed.

1.      By a unanimous November 13, 2004 resolution of Seneca's governing Tribal

Council, Seneca appointed Roscoe C. Howard, Jr., Esq. and the law firm, Sheppard Mullin

Richter & Hampton, LLP ("Sheppard Mullin"), as its Independent Counsel to review financial

transactions and other issues involving the financing and construction of a new Seneca casino

located in upstate New York.[1]  (Amend. Compl. and Answer ¶¶ 9; Ex. 1 to Amend. Compl. at p.

2.)  The November 13, 2004 resolution ("Authorizing Resolution") expressly authorized the

Independent Counsel "to retain forensic auditors and such other consultants as [it deemed]

necessary to conduct a thorough review." (Amend. Compl. and Answer ¶¶ 10; Ex. 1 to Amend.

Compl. at p. 2.)  Nor did the Authorizing Resolution limit in any way the Independent Counsel's

ability and authorization "to retain forensic auditors . . . ."

2.      Similarly, the Authorizing Resolution did not prohibit or in any way limit the

Independent Counsel's ability to execute agreements on Seneca's behalf or waive Seneca's

sovereign immunity in connection with his investigation activities on behalf of Seneca.  (Ex. 1 to

---

[1] The appointment of the Independent Counsel was specifically set forth in the certified, November 13, 2004 resolution of Seneca's Tribal Council as follows: "that Roscoe C. Howard, Jr. and the law firm of Sheppard Mullin Richter & Hampton, LLP . . . are hereby appointed as Independent Counsel to conduct an independent review . . . ." (Ex. 1 to Amend. Compl. at p. 2.  The Court may take judicial notice that Mr. Howard (who has since left Sheppard Mullin to join another law firm in Washington, D.C.) is a distinguished member of the bar and a former United States Attorney for the District of Columbia.

LEGAL02/30099460v4

Amend. Compl. at p. 2.)  Indeed, the Authorizing Resolution did not mention, nor seek to reserve, Seneca's sovereign immunity in any way.

### *The Agreement*

3.     On December 6, 2004, Mark E. Nagle, Esq., a partner of Sheppard Mullin, who worked on the Seneca engagement with and for Mr. Howard, signed an agreement (the "Agreement") with LECG, a forensic accounting, litigation support and consulting firm. (Amend. Compl. and Answer ¶¶ 3; Def. Br. at p. 4; Ex. 2 to Amend. Compl. at para. 1.)  Mr. Nagle's signature acknowledged that the Agreement had been "agreed and accepted" by Sheppard Mullin for itself "and on behalf of Seneca Nation of Indians."  (Ex. 2 to Amend. Compl. at p. 2.)

4.     The very first sentence of the Agreement states "that Sheppard, Mullin, Richter & Hampton LLP ('Counsel'), has been authorized on behalf of Seneca Nation of Indians ('Client') to engage LECG, LLC ('LECG') to provide consulting and backup support service(s) in the [internal accounting investigation for Seneca Nation of Indians]."  (Ex. 2 to Amend. Compl. at p. 1.)   The Agreement further clearly provides that the defined Client (Seneca) and the defined Counsel (Sheppard Mullin) and LECG are all parties to the contract. (*Id*.)

5.     The Agreement further states that "[a] copy of LECG's commercial terms, which Counsel accepts on its behalf and on behalf of Client, is attached."  (*Id*.)  The attached terms state that "If Counsel is retaining LECG to work on behalf of a third party, Counsel warrants that it is authorized by such third party to do so, and that such third party agrees to be responsible for payment and acknowledges its agreement to these commercial terms."  (*Id.*, at p. 3.) Accordingly, by the plain terms of the Agreement, Seneca engaged LECG and agreed to be responsible for payment of its fees.

6.     The terms attached to the Agreement included an arbitration and judicial

enforcement provision which provides as follows:

> Any controversy, dispute or claim between Client or Counsel on the one
> hand and LECG on the other hand <u>of whatever nature</u> arising out of, in
> connection with, or in relation to the interpretation, performance or breach
> of this agreement . . . shall be resolved at the request of either party to this
> agreement, by final and binding arbitration, administered by and in
> accordance with the then existing Rules of Practice and Procedure of
> Judicial Arbitration & Mediation Services, Inc. (JAMS), or its successor
> entity, and judgment upon any reward rendered by the arbitrator may be
> entered by any State of Federal Court having jurisdiction thereof.  Any
> such arbitration shall take place exclusively in Washington, D.C. . . . (*Id.*,
> at p. 4.)  (Emphasis added.)

7.     The Agreement also stated:  "LECG's standard practice is to obtain a retainer at

the commencement of an engagement.  A retainer of $10,000 is required upon execution of this

agreement."  (*Id.*, at p. 1).

### *Performance Under Agreement's Terms*

8.     On December 20, 2004, two weeks after the Agreement was signed, Seneca

confirmed to LECG that it was aware of the retainer term of the Agreement by issuing a check

for $10,000 to LECG "for Retainer."  (Ex. 3 to Amend. Compl. at p. 1.) (*See also*, Attachment to

Declaration of Riyaz Kanji in Support of Motion to Stay (hereinafter "Attach.") 11 at p. 2.)  The

check was drawn on Seneca's bank—KeyBank—and from Seneca's General Fund account.

Further, the check was endorsed by Seneca's most senior executives—Barry E. Snyder, Seneca's

President, and Maurice A. John, Seneca's Treasurer. (*Id.*)

9.     After the Agreement was executed and after Seneca paid LECG's $10,000

retainer, Seneca's Tribal Council further confirmed its prior appointment of the Independent

Counsel.  By a certified and unanimous resolution, on January 8, 2005, the Tribal Council

reaffirmed its Authorizing Resolution and resolved that the Independent Counsel "shall conduct

its review and have all necessary authority and power to receive all documents and other

- 4 -

information required to complete its review." (Attach. 2 at p. 2.) LECG was, by this date, heavily performing work on the engagement under the Agreement—a fact well-known to Seneca, its senior executives, and its Tribal Council. Again, in its second resolution, the Tribal Council did not prohibit or in any way limit the Independent Counsel's ability to execute agreements on Seneca's behalf or waive Seneca's sovereign immunity in connection with his investigation activities on behalf of Seneca. (Ex. 2 to Amend. Compl. at p. 2). (*Id*.) Likewise, as with the Authorizing Resolution, it did not mention or reserve sovereign immunity in any way.

10. After performing services under the Agreement, LECG sent its initial invoices to Sheppard Mullin, dated December 21, 2004 and January 21, 2005, for services rendered. (Attach. 3, 9.) By letter dated January 25, 2005, Sheppard Mullin sent the invoices to Seneca's Treasurer for payment. (Attach. 10.) Sheppard Mullin's letter enclosed LECG invoices and put Seneca on further notice that the invoices were "for services rendered by [LECG] on behalf of the Seneca Nation of Indians." (*Id*.) The letter also explicitly referred Seneca to the December 6, 2004 Agreement, stating that "[p]er their engagement on December 6, 2004, we are forwarding this invoice for your remittance directly to LECG, LLC." (*Id*.)

11. Seneca acknowledged receipt of Sheppard Mullin's January 25, 2005 letter by issuing two checks to LECG in the amount of the invoices forwarded by that letter. (Attach. 11 at pp. 4-5; Ex. 3 to Amend. Compl.) Seneca also issued a fourth check to LECG, in the amount of $229,834.95, for services reflected in an invoice dated February 11, 2005. (Ex. 3 to Amend. Compl.; Attach. 8; Attach. 11, at p. 6.)

12. Seneca's four checks to LECG totaled $270,539.39. (Amend. Compl. and Answer ¶¶ 15.) Each check, like the initial retainer check, was again drawn on Seneca's bank – Key

Bank – and was endorsed by Barry E. Snyder, Seneca's President, and Maurice A. John, Seneca's Treasurer. (*Id.*)

13.    LECG continued to work extensively on the Independent Counsel's investigation through April 2005.  During the course of its engagement, in between December 2004 and April 2005, LECG undertook and completed an enormous amount of work: LECG met with Seneca representatives; met with and interviewed other persons at Seneca's direction; traveled extensively to various sites, including Seneca territories; obtained and reviewed an innumerable amount of documents; and provided interim reports and presentations.  (Amend Compl. and Answer ¶¶ 14, 16-17.)[2]

14.    By invoices dated March 8, 2005, April 14, 2005 and May 23, 2005, LECG billed Sheppard Mullin and Seneca for its continuing services rendered in amounts totaling over $800,000.  (Amend. Compl. and Answer ¶¶ 19; Attach. 5-7.) Due to a so-called "dispute" over the "value" of LECG's services, "the Nation declined to act on [these] further invoices submitted by LECG to Sheppard Mullin."  (Def. Br. at p. 7.)

15.    Thereafter, LECG's repeated attempts to collect its fees went unheeded and Seneca continued to refuse payment. (Amend. Compl. and Answer ¶¶ 19.)  LECG first attempted a consensual resolution and engaged in direct communications with Seneca representatives. Notwithstanding these efforts, in a September 2, 2005 letter, Robert Odawi Porter, Seneca's Senior Policy Advisor and Counsel, expressed Seneca's position that LECG was no longer entitled to payment.  (Attach. 14.)  Seneca took the position that because an error was contained in an interim report provided by the Independent Counsel and LECG during an April 2005

---

[2] Indeed, the crowning irony of Seneca's position in this entire controversy is that in its efforts to predicate jurisdiction in the tribal court, it has repeatedly emphasized the considerable work done by LECG on tribal territory, but on the other hand, in its Answer (¶14) it denies acknowledging that LECG undertook and performed an enormous amount of work.  We submit that there can be no dispute as to the quantity of work performed by LECG on behalf of Seneca.

presentation,[3] LECG was not entitled to any payment notwithstanding—as has been argued by Seneca in its own tribal court—that LECG performed an enormous amount of work in connection with the Independent Counsel's investigation and final report.

16.    In September 2005, Seneca's Independent Counsel issued his final report (the "Report"). (Amend. Compl. and Answer ¶¶17.) The Report contained extensive references to LECG's work and virtually all of the findings and conclusions based on LECG's work have never been questioned. (*Id.*) (Indeed, although not included in the record of this proceeding, it is public knowledge that Seneca took a number of drastic steps as to the financing and construction of the subject casino project as a result of the Independent Counsel's report.)

### *JAMS Arbitration*

17.    On November 1, 2005, and pursuant to the terms of the Agreement that Sheppard Mullin had signed on behalf of Seneca, LECG filed with JAMS a demand for arbitration against Seneca for the outstanding amounts owed to it under the Agreement. (Amend. Compl. and Answer ¶¶ 20; Ex. 4 to Amend. Compl.)

18.    Seneca's Robert Porter responded to LECG's demand for arbitration in a letter to JAMS, dated November 22, 2005. (Amend. Compl. and Answer ¶¶ 21; Ex. 5 to Amend. Compl.) In that letter, Seneca asserted that the arbitration could not proceed because Seneca "has not expressly waived its sovereign immunity to allow such an arbitration proceeding to take place." (*Id.* at p. 1.)

19.    On December 16, 2005, JAMS' National Arbitration Committee issued a decision holding that, as clearly provided for in JAM's rules of procedures, any such jurisdictional and

---

[3] As the pleadings made clear, this error was quickly detected and corrected. (Amend. Compl. and Answer ¶¶ 18.) LECG contends that it had no meaningful consequence or adverse effect, and that Seneca is seizing upon this clerical mistake to avoid its clear obligation to pay. Seneca has refused to specify in any way how this error caused any damage to it or how it otherwise affected the value of LECG's enormous contribution to the Independent Counsel's final report.

arbitrability disputes had to be submitted and ruled on by the appointed Arbitrator.  (Amend. Compl. and Answer ¶¶ 22; Ex. 6 to Amend. Compl.)

20.    On January 17, 2006, in response to a Notice of Commencement of Arbitration from JAMS, Mr. Porter sent another letter that reiterated Seneca's sovereign immunity position: "The Seneca Nation is a sovereign nation and therefore must expressly waive its sovereign immunity for any such [arbitration] proceeding to take place . . .  The Nation has never done so with respect to any arbitration proceeding involving JAMS or LECG."  (Attach. 17.)

21.    On January 24, 2006, the Honorable James R. Melinson (Ret.) was appointed as the Arbitrator.  (Amend. Compl. and Answer ¶¶ 23.)  Mr. Melinson is a retired United States District Court judge who served for many years with distinction on the bench of the United States District Court for the Eastern District of Pennsylvania in Philadelphia.

### *Seneca's Efforts in its Tribal Court*

22.    The very next day, on January 25, 2006, Seneca filed a complaint in the Seneca Nation of Indians Peacemakers Court, Allegany Territory ("Peacemakers Court")—its tribal court located in upstate New York outside of Buffalo.  (Ex. 7 to Amend. Compl.)  The complaint named both LECG and JAMS as defendants.  The complaint did not seek to resolve Seneca's liability for any of the amounts claimed by LECG, and it did not seek any ruling or declaration with respect to Seneca's claims of sovereign immunity.  Rather, Seneca's tribal court pleading sought only to block the JAMS arbitration proceeding which, at that point, had been ongoing for almost three full months.  (Amend. Answer ¶¶ 25.)  In the complaint, Seneca merely reiterated that "[t]he Nation, as a sovereign, possesses immunity from lawsuits and/or arbitration proceedings." (Ex. 7 to Amend. Compl. at p. 3.)

23.     That same day, Seneca sought and obtained an *ex parte* temporary restraining order from the Peacemakers Court. (Ex. 7 to Amend. Compl.; Attach. 22.)  The temporary restraining order purported to prohibit LECG and JAMS from "commencing, prosecuting, administering, carrying on, holding and/or determining any arbitration proceeding . . . against [Seneca].  (*Id.*)

24.     JAMS advised LECG that it was prepared to go forward with the arbitration proceeding, *ex parte*, since under its rules it recognized only the jurisdiction of the state and federal courts and not that of tribal courts. (Amend Compl. and Answer ¶¶ 24.)

25.     The parties then entered into a global standstill agreement, dated February 7, 2006, in an effort to foster settlement.  (Amend. Compl. and Answer ¶¶ 27; Attach. 25.) Ultimately, a meeting was scheduled in July 2006, but no settlement was achieved.  (*Id.*)  Seneca continued to maintain that LECG could not sue for its unpaid fees in any state, federal, tribal or arbitral court or forum.

26.     On July 24, 2006, faced with Seneca's repeated assertions of sovereign immunity, LECG commenced this action.  (Amend. Compl. and Answer ¶¶ 28.)  Later that same day, Seneca sought and obtained another temporary restraining order in the Peacemakers Court purporting to enjoin LECG from pursuing any arbitration proceedings, and it also sought a preliminary injunction seeking the same relief.  (*Id.*, at ¶¶ 29; Attach. 26.)

27.     Consistent with its previous efforts to avoid jurisdictional confrontations, in a letter dated August 1, 2006, LECG advised the Peacemakers Court that it did not recognize Peacemakers Court jurisdiction and would not appear; LECG also noted that Seneca failed to serve properly the July 24, 2006 Peacemakers Court order.  LECG also advised the Peacemakers Court that "out of deference and respect [for the tribal court]," it would not pursue any

arbitration proceedings until a ruling was issued in the declaratory judgment action which LECG had commenced in the United States District Court for the District of Columbia. (Amend. Compl. and Answer ¶¶ 30.)  LECG reiterated its position in an August 11, 2006 letter to the Peacemakers Court. (Attach. 28.)

28.    On August 30, 2006, the Peacemakers Court entered a *sua sponte* order. This order recognized that, in light of LECG's stated position, any further injunction proceedings were moot, and in fact, the Peacemakers Court vacated its own previously issued temporary restraining order.  However, without any party having requested it, the Peacemakers Court further purported to order the parties to exchange briefs on September 29, 2006 "on all issues relating to the [court's] jurisdiction."  (Attach. 29, at p. 3.)

29.    On September 12, 2006, Seneca answered LECG's declaratory judgment complaint and admitted, *inter alia*, that this Court has jurisdiction over this dispute. (Answer ¶¶ 5-7.)

30.    In a letter dated September 25, 2006, LECG advised the Peacemakers Court that it did not intend to submit briefs or otherwise appear in the tribal court action because, again, it did not believe the tribal court could exercise jurisdiction over it; that it would proceed with its pending federal court declaratory judgment action; and that, since Seneca's complaint did not contain any claim for relief other than preventing arbitration from proceeding and LECG had agreed not to pursue any such arbitration out of deference and respect to the tribal court, Seneca's tribal court complaint was moot.  (Attach. 29.)  LECG furthered stated that since Seneca had already submitted itself to the jurisdiction of the federal court, it was in the best interest of all involved to allow the federal court to render a decision on the completely dispositive question of whether Seneca waived its sovereign immunity. (*Id.*)

- 10 -

31.     Not surprisingly, however, on September 29, 2006, Seneca submitted a "jurisdictional brief" to its Peacemakers Court.[4]   On October 3, 2006, Seneca filed its motion to stay in this Court.

## ARGUMENT

This case arises out of a commonplace contract dispute for which that contract provided an explicit dispute resolution mechanism.  However, notwithstanding its admissions as to its own knowledge of, and its partial performance of, the operative Agreement, Seneca steadfastly refuses to address the merits of the dispute.  According to Seneca, LECG is absolutely and unqualifiedly barred by sovereign immunity from obtaining any relief in any court or forum.  When LECG refused to accept Seneca's position and brought this declaratory judgment action to determine whether Seneca had waived its sovereign immunity, Seneca took steps, consistent with its approach from the outset, to make that effort as prohibitively time-consuming and expensive as possible.  Asserting the tribal exhaustion doctrine, Seneca now claims that LECG cannot litigate in this Court until it first litigates in the tribe's own Peacemakers Court where, Seneca stated in its letter to JAMS, "[t]he relevant law for determining whether the Nation is subject to an arbitration is Nation law," and where "Nation courts have ruled repeatedly that the Nation and its subdivisions have sovereign immunity."  (Ex. 5 to Amend. Compl. at pp. 1-2.)   Indeed, Seneca has filed a long brief in its Peacemakers Court focused on the issue of whether that tribal court can even assert jurisdiction over LECG (which it cannot in any event), and that frolic and detour is an enormous distraction.  It is, again, nothing more than a ploy to digress from the sole legal issue on which this controversy turns.

---

[4] As noted above, this tribal court brief submitted by Seneca goes on at great length to speak of how Seneca and LECG had a "commercial relationship" pursuant to which LECG performed regular and considerable amounts of work on and within tribal territory.

LEGAL02/30099460v4

It is important at the outset to understand that hub on which all else spins in this case. If, as LECG contends and as the undisputed facts and documents make clear, Seneca waived its tribal sovereign immunity, then arbitral jurisdiction over the merits follows *a fortiori*. The parties can then present their legal and factual contentions to the Arbitrator under the auspices of JAMS in Washington, D.C. If, on the other hand, this Court finds that there has been no waiver, then LECG (subject to its rights of appeal) is simply foreclosed, and it would not be able to assert its claim against Seneca anywhere.

Seneca's absolutist sovereign immunity defense has no merit. As LECG explains below, the Supreme Court has held, consistent with prior federal court decisions, that Indian tribes waive sovereign immunity when they agree to arbitration provisions like the one in the Agreement. *C & L Enterprises, Inc. v. Citizens Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001)("*Potawatomi*"). The law is equally clear that the tribal exhaustion doctrine does not apply where, as here, resolution of the dispute does not involve issues concerning internal tribal affairs, and where, as here, exhaustion would be futile, and the tribe has proceeded in bad faith. It therefore follows that Seneca's motion to stay should be denied, and that LECG's motion for judgment on the pleadings should be granted in all respects with the issuance of a declaratory judgment in favor of LECG.

## I.    SENECA'S MOTION TO STAY SHOULD BE DENIED BECAUSE THE TRIBAL COURT EXHAUSTION RULE DOES NOT APPLY

### A.    This Dispute Concerns Whether Seneca's Agent Had Apparent Authority to Execute the Agreement on Seneca's Behalf, Which Does Not Concern Tribal Law or Internal Tribal Affairs

Seneca argues that the tribal court exhaustion rule applies because "*[i]t is the proper interpretation of this [the November 13, 2004] Resolution that lies at the heart of this case.*" (Def. Br., at p. 4, emphasis added.) But, once one recognizes that the key issue in this case is <u>not</u>

(as Seneca claims) whether the Authorizing Resolution authorized Sheppard Mullin to waive sovereign immunity, but rather whether Sheppard Mullin had apparent authority to agree to the terms of the Agreement (including the arbitration and judicial enforcement provision), it is clear that Seneca's tribal exhaustion argument is meritless. It is obvious that Seneca so frames the issue in a transparent attempt to portray this as a "tribal law" issue. However, Sheppard Mullin's apparent authority depends solely upon the application of District of Columbia law to the actions of Seneca and its admitted agent/attorney, which created Sheppard Mullin's apparent authority to accept the terms of the Agreement with LECG, and not upon the consideration of any matters involving Seneca's tribal resolutions or its internal tribal affairs.

The tribal exhaustion doctrine is "'prudential,' not jurisdictional," and requires "careful examination" of the circumstances relating to tribal sovereignty. *Strate v. A-1 Contractors*, 520 U.S. 438, 449, 451 (1997). "Because the tribal exhaustion rule does not impair jurisdiction, and instead is 'analogous to principles of abstention articulated in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976),' . . . the doctrine must be interpreted narrowly in light of the 'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them.'" *Garcia v. Akwesasne Housing Auth.*, 268 F.3d 76, 80 (2d Cir. 2001).

Recognizing these principles, courts have refused to apply the tribal exhaustion doctrine to disputes like this one. In *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803 (7th Cir. 1993), the court considered whether the doctrine should apply to the claim of a law firm that had been retained by a medical supply company, which in turn had contracted with an Indian tribe to create a manufacturing business. The law firm sued the tribe, claiming that it was a third party

- 13 -

beneficiary of the medical supply company's agreement with the tribe, which contained an Illinois choice of law provision that waived the tribe's sovereign immunity.

The court rejected both the tribe's sovereign immunity argument and its tribal exhaustion doctrine argument. *Id*. at 812-15. With respect to the latter, the court found that the application of tribal exhaustion required an examination of "the factual circumstances of each case . . . in order to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine." *Id*. at 814. Rejecting application of tribal exhaustion to the facts before it, the court held that the issue in dispute was not "integral to the tribe's self-government and self-determination," but rather "concern[ed] a contract that both parties agreed would be interpreted under Illinois law." *Id*. The court explained that the application of the tribal exhaustion doctrine to the contract interpretation issues in that case would defeat the tribal sovereignty goals underlying that doctrine: "To refuse enforcement of this routine contract provision would be to undercut the Tribe's self-government and self-determination. . . . If contracting parties cannot trust the validity of choice of law and venue provisions, [the Tribe] may well find itself unable to compete and the Tribe's efforts to improve the reservation's economy may well come to naught." *Id*. at 815. This logic is equally applicable here.

State courts have also recognized this important distinction and have refused to apply the exhaustion doctrine specifically where, as here, the core issue is one of apparent authority on which a claim of tribal sovereign immunity hinges. In *Granite Valley Hotel L.P. v. Jackpot Junction Bingo and Casino*, 559 N.W.2d 135 (Minn.App.), *rev. denied*, No. C8-96-1024 (1997), the court refused to apply the tribal exhaustion doctrine in circumstances that are four square with this case. There, the tribe entered into a contract with a motel owner, which agreed to build the motel to serve the tribe's casino operations in return for the tribe's guaranteeing certain

occupancy levels.    The agreement was signed by the casino's general manager on behalf of the

tribe.  When a dispute arose, the motel owner sued the tribe, and the tribe asserted sovereign

immunity contending that the state court "must, as a matter of law, defer to the Community's

tribal court for determination whether the Community effectively waived its sovereign immunity

and consented to the jurisdiction of the Minnesota courts."  *Id*. at 137.  The court rejected both

arguments, finding that, as a matter of law, the casino manager's apparent authority (as opposed

to actual authority) to agree to the sovereign immunity waiver, did not "require analysis of issues

central to the governance of an Indian tribe, which must be heard by a tribal court":

> Jackpot Junction contends that this case begs the question of proper
> delegation of authority to [the casino general manager], and, therefore, it is
> necessary to review the Community's delegation documents and
> procedures.  However, the facts of this case present issues of contract
> interpretation and apparent authority, rather than actual authority.  In
> rendering its decision, the trial court reviewed the contract, pleadings, and
> affidavits submitted by both parties, without having to resort to tribal
> documents or procedures for guidance.  While examination of tribal
> documents may be necessary to resolve a question of actual authority,
> apparent authority is a question for the trier of fact to decide after
> considering the parties' dealings under the contract, the defendant's
> actions, and other outward manifestations of delegation of authority.  *Id*.

The analysis in *Granite Valley* applies here.[5]  In the District of Columbia where the

contractual relationship at issue was formed, "apparent authority of an agent arises when the

principal places the agent 'in a position which causes a third person reasonably to believe the

principal has consented to the exercise of authority the agent purports to hold.  This falls short of

an over, affirmative representation by the principal . . . .'"  *Steiger v. Chevy Chase Savings

Bank*, 666 A.2d 479, 482 (D.C. 1995).  Importantly, an agent acting pursuant to apparent

authority can bind the principal, even though the principal does not know of the agent's conduct

until after a third person has relied upon that conduct to its detriment.  *See id*. at 481 (principal

---

[5] We submit that the long concurring opinion in *Granite Valley*, which speaks to the reality of certain litigation
tactics, is also directly applicable here.

did not learn of charges he did not authorize until after the merchants had already accepted

them).[6]  Further, "[i]n the principal's relations with third parties, restrictions that the principal

has placed on the agent's authority are inoperative if apparent authority is present just as, by

analogy, an offeror's unexpressed meaning that is unknown to the offeree is inoperative as to the

offeror's contractual relations with the offeree."  *Restatement 3d of Agency* § 2.03 (2006).

Contrary to Seneca's argument that Sheppard Mullin's authority to execute the

Agreement on Seneca's behalf is a tribal law question, Sheppard Mullin's apparent authority can

be determined from the following:

- Mr. Howard/Sheppard Mullin's undisputed retention by Seneca as its attorney and agent;

- The unmistakable words of authority appearing <u>twice</u> on the face of the Agreement;

- The specific notice that Sheppard Mullin provided to Seneca of LECG's engagement;

- Seneca's confirmation to LECG of its acceptance of the terms of LECG's engagement through its payment to LECG of the retainer required by the Agreement, and subsequently, the payment of invoices, in the amount of approximately $270,000, issued by LECG pursuant to the Agreement;

- The manner and form of those payments made directly by Seneca to LECG; and

- LECG's reasonable reliance on Sheppard Mullin's explicitly stated authority to execute the Agreement.

None of these facts involves in any way Seneca's internal tribal affairs, on which the tribal

exhaustion doctrine is premised.

---

[6] This is, of course, <u>usually</u> the situation in apparent authority cases as the Court can well appreciate.  Here, the tribe obviously knew about LECG's engagement, and partially performed the Agreement with LECG.  For purposes of this motion, we accept Seneca's allegation (and its apparent position) that it did not review the arbitration clause of the Agreement at the time LECG was engaged or during the course of its work. That is, however, simply irrelevant to the apparent authority issue.

Seneca also argues that tribal exhaustion is required because the dispute here turns on "interpretation" of tribal law. (Def. Br., pp. 23, 25.) This too is a transparent litigation ploy. That argument is simply another form of Seneca's feigned actual authority argument; the only reason why the interpretation of tribal law could possibly matter would be if the issue were the scope of Sheppard Mullin's actual authority. As explained above, however, that is simply, and obviously, not the issue for determination here. After all, Roscoe Howard/Sheppard Mullin was Seneca's duly-appointed Independent Counsel; Sheppard Mullin did engage LECG on behalf of Seneca; Seneca did partially perform under the Agreement; and Sheppard Mullin and LECG did undertake an enormous amount of legal and forensic accounting work which culminated in several interim reports and a final report delivered to Seneca in September 2005.[7]

Lastly, Seneca argues that case law requires tribal exhaustion in cases where the validity of an arbitration provision is at issue. (Def. Br., pp. 15-21.) But none of the cases cited by Seneca even mentions, much less analyzes, whether tribal exhaustion applies where the only issue is whether the tribe's attorney/agent had apparent authority to sign an agreement resulting in the waiver of tribe's sovereign immunity. The cases relied upon by Seneca are thus simply beside the point—and, it is telling that the only cases which address the precise issue presented here hold that the exhaustion doctrine does not apply.

### B.    Tribal Exhaustion Would Be Futile in This Case

Even assuming *arguendo* that the tribal exhaustion doctrine somehow applied here, the Supreme Court has said that there are exceptions to the doctrine "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith, . . . or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be

---

[7] It is noteworthy that the appointment of the Independent Counsel to review questionable issues regarding the underlying casino project was a decidedly high-profile matter for Seneca. This was not something that happened on the side while the Tribal Council was involved with other matters.

futile because of lack of an adequate opportunity to challenge the court's jurisdiction." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 n. 12 (1985). Thus, recognizing what has come to be known as "the futility exception," many courts have not required parties to exhaust tribal remedies when doing so would be futile. *See, e.g., Ransom v. Babbitt,* 69 F. Supp. 2d 141 (D.D.C. 1999). *See also Comstock Oil & Gas Inc. v. Alabama and Coushatta Indian Tribes of Texas,* 261 F.3d 567 (5th Cir. 2001)*, reh'g and reh'g en banc denied*, 275 F.3d 1084 (5th Cir. 2001) and *cert. denied*, 535 U.S. 971 (2002)*; Krempel v. Prairie Island Indian Community,* 125 F.3d 621 (8th Cir. 1997), *reh'g and suggestion for reh'g en banc denied*, (Oct. 29, 1997); *Johnson v. Gila River Indian Community,* 174 F.3d 1032 (9th Cir. 1999).

It is difficult to comprehend what has motivated Seneca in its dealings with LECG, and why a straightforward contract dispute has now germinated proceedings in an arbitral forum, a tribal court, and a federal district court. Through its use of the Peacemakers Court to skew the JAMS arbitration; its insistence that LECG go through the pointless exercise of litigating in the Peacemakers Court; and its assertion of procedural defenses in this Court that delay any resolution on the merits, Seneca has made it clear that it will do anything to avoid addressing the real issues. This is particularly unnecessary since Seneca itself has explicitly recognized that this Court does have jurisdiction to adjudicate the core legal issue. Rather than resolving the core, Seneca asks the Court to abstain from exercising its acknowledged and obvious jurisdiction so that irrelevant issues (such as personal jurisdiction over LECG in the Peacemakers Court) can be litigated elsewhere. This is bad faith and harassment, and it should not be countenanced by this Court.

Moreover, regardless of Seneca's motivations, it would be quintessentially "futile" for LECG to assert its claim in the Seneca Peacemakers Court where, as Seneca specifically told

JAMS in writing "[t]he relevant law for determining whether the Nation is subject to an arbitration is Nation law," and where "Nation courts have ruled repeatedly that the Nation and its subdivisions have sovereign immunity." (Ex. 5 to Amend. Compl. at pp. 1-2.) Thus, Seneca has already told JAMS how its Peacemakers Court views issues of tribal sovereignty. And, of course, as of this date, that issue had not been alleged or even framed by Seneca in the Peacemakers Court. Finally, if and when Peacemakers Court proceedings ever reached that stage, LECG would certainly be returning to this Court for a decision on the merits of Seneca's sovereign immunity claim. To embroil both sides in years of digressive litigation is the essence of "futility" and tactical gamesmanship.

## II.     LECG'S MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED BECAUSE SENECA CLEARLY WAIVED ITS SOVEREIGN IMMUNITY AND SUBJECTED ITSELF TO THE ARBITRAL FORUM

The standard for granting a motion for judgment on the pleadings pursuant to Fed. R. Civ. Pro. 12(c) is essentially the same as that on a Rule 12(b)(6) motion. *United States v. AT&T Corp.*, 424 F.Supp.2d 11, 20 n.11 (2006). The court must accept the non-movant's allegations as true, viewing the facts in the light most favorable to the nonmoving party. *See*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).[8]

### A.     Seneca Waived Sovereign Immunity in the Agreement

*Potawatomi* is the relevant precedent for this case and is directly applicable. In *Potawatomi*, the tribe, like Seneca, asserted sovereign immunity as an absolute and unqualified defense to a contractor's breach of contract claim. The tribe even argued to the Supreme Court that no court – "on earth or even on the moon" — had jurisdiction over the contractor's suit

---

[8]     To the extent that the Court feels the need to consider materials outside the pleadings, such as Seneca's motion to stay and the accompanying brief and exhibits, LECG's motion may be treated as a Rule 56 summary judgment motion. At the request of the Court, LECG will submit Seneca's Peacemakers Court brief as well.

because there had been no express waiver of sovereign immunity. *Id.* at 421. The Supreme Court, however, held decidedly to the contrary, finding that the tribe had waived sovereign immunity by entering into a contract with an arbitration provision that, like the one in the Agreement, provided for arbitration of disputes arising under the contract and consent to "judgment upon the arbitration award . . . in any federal or state court having jurisdiction thereof." *Id.* at 415. Rejecting the assertion that a waiver of sovereign immunity can only be effected by the use of those specific words, the Court reached the common-sense conclusion that "by the clear import of the arbitration clause, the Tribe is amenable to a state-court suit. . . ." *Id.* at 628-29.

Given the Supreme Court's 2001 holding in *Potawatomi*— and as the Supreme Court noted, federal courts had previously held that entering into an agreement to arbitrate constituted a waiver of tribal sovereignty, 532 U.S. at 417 (citing *Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656, 661 (7th Cir. 1996); *Native Village of Eyak v. GC Contractors*, 658 P.2d 756 (Alaska 1983); *Val/Del, Inc. v. Superior Court*, 703 P.2d 502 (Ct. App. 1985))— the only issue for decision in this case is whether the provision in the Agreement is valid and enforceable against Seneca. If it is, Seneca has waived sovereign immunity and must arbitrate before JAMS in accordance with the provision. Conversely, if the provision is not valid and enforceable, Seneca has not waived sovereign immunity, and LECG cannot pursue its claims against Seneca.

### B. Since Seneca's Agent Was Apparently Authorized to Execute the Agreement On Seneca's Behalf, the Agreement's Arbitration and Judicial Enforcement Provision Is Valid and Enforceable Against Seneca

Seneca should be bound by the Agreement because Sheppard Mullin certainly had apparent authority to act on Seneca's behalf. Seneca argues that the Agreement's arbitration and judicial enforcement provision is not valid and enforceable because the Authorizing Resolution

did not authorize Sheppard Mullin "to subject the Nation to binding arbitration or to otherwise waive the Nation's sovereign immunity from unconsented legal proceedings. *It is the proper interpretation of this Resolution that lies at the heart of this case.*"  (Def. Br., at pp. 3-4, emphasis added, citation and footnote omitted.)  As noted above, this simply misses the mark. There is no question that no tribal resolution ever stated:  "Seneca waives its sovereign immunity with respect to the agreement Sheppard Mullin entered into on the tribe's behalf with LECG."  It is equally well-established <u>as</u> <u>a</u> <u>matter</u> <u>of</u> <u>federal</u> <u>law</u> that the same is not required to find a waiver of tribal sovereign immunity.  *Potawatomi*, 532 U.S. at 420 (rejecting the tribe's argument that no express waiver had been made by the language of the arbitration clause) (internal citation omitted); *Sokagaogon*, 86 F.3d at 659-60 (rejecting the notion that only language such as "tribe will not assert the defense of sovereign immunity if sued for breach of contract" was required for the tribe to waive sovereign immunity).

        Furthermore, there is no dispute that Sheppard Mullin was acting for all relevant purposes here as Seneca's attorney and agent.  In its brief, Seneca admits that "[b]y formal resolution, the Council appointed Independent Counsel to conduct this investigation.  Pursuant to the authority granted in that Resolution, Sheppard Mullin retained LECG . . ."  (Def. Br., at 27, internal citation omitted.)  By retaining Sheppard Mullin in this capacity, Seneca placed it in the position to hold itself out to LECG as authorized to make the following statements in the Agreement:  (1) Sheppard Mullin "has been authorized on behalf of Seneca Nation of Indians ('Client') to engage LECG, LLC ('LECG') to provide consulting services and backup support;" (2) Sheppard Mullin "agreed and accepted" the terms of LECG's November 29, 2004 letter not only for itself, but also "on behalf of Seneca Nation of Indians;" (3) Sheppard Mullin accepted LECG's standard commercial terms "on its behalf and on behalf of Client;" and (4) that Sheppard Mullin was

"authorized by [Seneca] that it is authorized to [retain LECG to work on Seneca's behalf], and that [Seneca] agrees to be responsible for payment and acknowledges its agreement to these commercial terms," including the arbitration and judicial enforcement provision.

By appointing Sheppard Mullin as its attorney and agent and enabling it to make these representations of authority, Seneca obviously confirmed to LECG that Seneca had consented to the exercise of the precise authority that Sheppard Mullin _explicitly_ represented.  Seneca further confirmed Sheppard Mullin's apparent authority to LECG by issuing a check in the amount of $10,000 to LECG "for Retainer," the exact retainer amount required by the terms of the Agreement.  Seneca also confirmed Sheppard Mullin's apparent authority to LECG by not correcting, or in any way taking issue with, Sheppard Mullin's representations in the Agreement, when given the opportunity to do so.  In its January 25, 2005 letter transmitting LECG's bills, Sheppard Mullin specifically referred Seneca to the Agreement it had executed on Seneca's behalf, stating that the invoices were being submitted "per [LECG's] engagement on December 6, 2005."  Even if Seneca did not accept this invitation to review the terms of the Agreement, as it now claims, LECG certainly had every reason to believe that Seneca had done so before remitting hundreds of thousands of dollars in payments to LECG.[9]

LECG reasonably relied on Sheppard Mullin's apparent authority to accept the terms of the Agreement.  LECG certainly would not have agreed to work for Seneca if it had believed that Sheppard Mullin was not authorized to agree to the commercial terms of the Agreement, and that LECG would face an absolute sovereign immunity bar to recovery in the event of nonpayment. In fact, had Seneca advised LECG in January 2005, when Sheppard Mullin explicitly notified Seneca of the "engagement on December 6, 2004," that the arbitration provision in the

---

[9] In reality, Seneca's position is nothing more than an acknowledged contract counterparty stating that it has a valid defense to a contract because it did not carefully read it!

Agreement was invalid, LECG could have discontinued its engagement at that time and avoided the subsequent work for which payment is now in dispute. LECG thus undertook to perform the very work at issue in reliance upon Sheppard Mullin's apparent authority to agree to the terms of the Agreement on behalf of Seneca.

The doctrine of apparent authority applies fully to Indian tribes in their dealings with third party contractors. Importantly, in many reported cases on tribal sovereign immunity, the tribe argued as its primary or "fall-back" argument, that the signatory to the arbitration agreement was not "authorized." However, the courts have consistently rejected these approaches and, as noted above, the facile notion that only a specific tribal resolution (of the sort Seneca attached to its Answer – as if this Court would lack jurisdiction but for such a resolution) can constitute a waiver. *Potawatomi*, 532 U.S. at 420.

Indeed, courts have held <u>specifically</u> that a tribe's sovereign immunity can be waived by an agent acting with apparent authority. In *Rush Creek Solutions, Inc. v. Ute Mountain Tribe*, 107 P.3d 402 (Colo. Ct. App. 2004), *cert. denied*, 2005 WL 39177 (Colo. 2005), a computer services provider sued a tribe for failing to make payments under their contract in Colorado state court, relying on a provision of the contract in which the tribe waived any objection to jurisdiction and venue. Although the tribe was forced to admit that this provision waived sovereign immunity, it argued (like Seneca) that the person who signed the contract, the tribe's CFO, was not authorized to execute the waiver. The court disagreed, holding that on the undisputed facts, apparent authority existed <u>as</u> <u>a</u> <u>matter</u> <u>of</u> <u>law</u>:

> At all relevant times, the CFO was authorized to enter into contracts on behalf of the Tribe. The contract at issue here designates the Tribe as the customer. The CFO signed the contract on behalf of the customer on a line above the statement, "authorized signature." The Tribe's Constitution and personnel policy are silent concerning procedures for signing contracts, waiving sovereign immunity, or authorizing persons to sign

waivers. Rush Creek and the Tribe performed their respective obligations . . . for eighteen months before the dispute in this case arose. *Id.* at 407-08.[10]

This is squarely applicable here.

The tribe in *Rush Creek* also argued, like Seneca (Def. Br., pp. 3-4), that only a tribal council resolution authorizing a tribal agent to waive sovereign immunity in those very words could constitute a waiver. The court had no difficulty rejecting same: "When, as here, a person has authority to sign an agreement on behalf of a sovereign, it is assumed that the authority extends to a waiver of immunity contained in the agreement." *Id.* at 408, citing *Restatement (Third) of the Law of Foreign Relations of the United States* § 456 cmt. b (1987) and *Potawatomi, supra*. Here, there is no dispute that Seneca authorized Sheppard Mullin to enter into an agreement to retain forensic accountants on Seneca's behalf. Having granted that authority to Sheppard Mullin, "it is assumed that the authority extends to waiver of authority contained in the agreement." *Id.*

### C. The Agreement Should Be Enforced Because Seneca Ratified Sheppard Mullin's Actions and Performed Under the Agreement's Express Terms

There is more. LECG should also prevail because Seneca ratified the Agreement. Under black letter agency law, a "ratification occurs when the principal [Seneca], with knowledge of an act which the agent [Sheppard Mullin] was not authorized to do at the time, acquiesces in it, by allowing the agent to do similar acts, or by retaining the benefits of the act when done in service to him. . . ." *NB Specialty Prods., Inc. v. BMR, Inc.*, Civ. A. No. 86-1309, 1987 WL 13963, *7 (D.D.C. July 6,1987) (citations omitted). The District of Columbia has repeatedly applied the principle of ratification. In *Lewis v. Washington Metro. Area Transit Auth.*, the court

---

[10] The court distinguished the decision in *World Touch Gaming, Inc. v. Massena Mgmt., LLC*, 117 F.Supp.2d 271 (N.D.N.Y. 2000), where apparent authority was not found because the tribe's constitution expressly stated that only the tribal council could waive sovereign immunity. *Id.* at 406-17. Defendant's brief does not cite any comparable provision in the Seneca constitution, so the rationale of *World Touch Gaming* does not apply here.

held that a "principal may ratify the act expressly or impliedly, by conduct inconsistent with any other hypothesis; and once he has done so he is bound by the agent's act *nunc pro tunc*." 463 A.2d 666, 671-72 (D.C. 1983).  Further, ratification principles can and have been applied in cases involving Native American tribes.  For example, even in cases where an agent lacks the authority to waive a tribe's sovereign immunity, "an otherwise ineffective waiver may become binding if it is later ratified . . . ." *Big Valley Band of Pomo Indians v. The Superior Court of Lake County*, 133 Cal. App. 4th 1185, 1191 (Cal. Ct. App. 2005).

The proof of Seneca's knowledge is over-whelming—even if one accepts its "we never read the fine print" argument.   Seneca knew Sheppard Mullin engaged LECG on its behalf almost immediately following the execution of the Agreement on December 6, 2004, because its $10,000 retainer check is dated December 20, 2004.    Seneca also worked with LECG representatives beginning in December 2004.  Seneca's ratification can further be found in its second Tribal Council resolution and because it repeatedly acquiesced to and performed under the Agreement.  For example, Seneca thereafter received a letter that specifically referenced the Agreement and sums owed to LECG, and Seneca remitted over $270,000 in direct payments to LECG.  Seneca thereafter continually made personnel available to LECG for questioning and documents/records available to LECG for review.   LECG also participated directly in presentations to Seneca in early 2005.

In sum, as explained above, the only issue for decision in this case is whether Sheppard Mullin had apparent authority.  If it had such authority, Seneca has incontrovertibly waived its sovereign immunity under *Potawatomi* and must proceed to arbitration before JAMS in accordance with the terms of the Agreement.  On that issue, there are no material facts in dispute. Just as the courts in *Rush Creek, supra* and *Granite Valley, supra*, found, judgment on the

pleadings, as a matter of law, can be entered on Sheppard Mullin's apparent authority.  Even if this Court does not find that Sheppard Mullin had the apparent authority to execute the Agreement on Seneca's behalf, the Agreement should still be enforced under common law contract and agency principles because Seneca partially performed under the Agreement's express terms and ratified it.

## CONCLUSION

For all the foregoing reasons, LECG respectfully requests that the Court (1) deny Defendant's motion to stay this action, and (2) grant LECG's motion for judgment on the pleadings and enter a declaratory judgment on the Complaint herein in favor of LECG.

Dated: October 30, 2006

Respectfully submitted,

  /s/ Timothy A. Ngau
John F. Cambria, Esq.
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel.: (212) 210-9400
(Admitted *pro hac vice*)

Timothy A. Ngau, Esq. (D.C. Bar no. 339333)
ALSTON & BIRD LLP
The Atlantic Building
950 F Street, N.W.
Washington, D.C. 20004
Tel.:  (202) 756-3300

Attorneys for Plaintiff LECG, LLC